SINCLAIR OIL & GAS COMPANY, a corporation, Woods Petroleum Corporation, a corporation, Republic Natural Gas Company, a corporation, Harper Oil Company, a corporation, Walter J. Tuohy, Bernard Shanker and A. D. Freshour, Plaintiffs in Error,

v.

Troy O. BISHOP, Virginia L. Bishop and H. E. Parrott, individually, and as Executor of the Estate of Laura Parrott, Deceased, Defendants in Error.

No. 40585.

Supreme Court of Oklahoma.

July 18, 1967.

As Amended May 6, 1968.

Reversed and remanded with directions.

A. A. Davidson, Ted D. Foster, Jr., Tulsa, for Sinclair Oil & Gas Co.

Paul Brown, Robert W. Richards, T. Murray Robinson, Oklahoma City, for plaintiffs in error.

Joseph A. Young, Chandler, and Young, Young & Young, by Glenn A. Young, Sapulpa, for defendants in error.

BERRY, Justice.

This action was brought by the lessors to cancel lessees' oil and gas lease for failure to prudently develop, operate, and produce the same, in violation of implied covenants and express terms of an oil and gas lease.

The lease, or leases, involved cover tract herein identified as the Bishop tract or lease. This lease was acquired originally from the lessors by Sinclair Oil and Gas Company, which in turn was assigned to Woods Petroleum Corporation, which in turn assigned the lease to Harper Oil Company and Republic Natural Gas Company. The named oil company defendants are plaintiffs in error in this Court. References to other parties involved will be excluded unless further identified. The defendants will be identified as lessees, or individually as Sinclair, Woods, Harper, or Republic. The plaintiffs will be identified as lessor, or lessors, or individually.

The following pertinent facts, some of which are disputed, show that Sinclair obtained the Bishop lease (primary terms of which would expire April, 1959) and assigned it to Woods reserving an overriding interest. Woods commenced operations on the Bishop tract within the primary term

of the lease. The well was drilled to the Wilcox Sand which was proved non-productive, and the bore-hole plugged back, casing set, and the well completed in the Skinner Sand. The electric log indicated "possible oil or gas" in an approximate 30 foot interval in the Skinner formation. The electric log and sand samples also indicated "possible oil or gas" in a 10 foot section at an interval lying 1000 feet above the Skinner zone which section constituted the Cleveland Sand. Only the Skinner Sand was cemented in preparation for testing and completing.

On October 28, 1958, after pipe was set and the hole swabbed, the bottom two feet of the possible productive portion of the Skinner Sand (4336½' to 4338½') was perforated as calculated from an electric log and core samples which theretofore had been analyzed. The bore hole was then swabbed and left open with an estimated gas flow of 50 MCF per day. Seven hours later, after again swabbing, the hole was perforated between 4325' to 4335' after which there was a substantial increase in the gas flow, estimated at 750 MCF. (The record reflects a conflict as to whether there was any show of oil after perforating and swabbing. Lessors contend there was a slight show of oil; while lessees claimed no show.)

We here note that the evidence fairly shows that the perforations were made in the lower part of the productive permeable zone of the Skinner Sand. The entire permeable zone as reflected by plaintiffs' exhibits appears to be from 4312 to 4344 feet. The perforated section was from 4325 to 4338½ feet. Expert testimony reflects the estimated oil-gas contact line at 4325 feet depth.

On November 4, 1958, after sandfracing with 250 barrels of free oil and carbon, plus 5000 pounds of sand, the flow of gas increased to an estimated 3750 MCF per day. On that date a notation on the geological file sheet reflects: "Shut-in for gas market."

On December 3, 1958, a 12½ hour completion test was run with the well producing at an approximate rate of 66 barrels of oil per day and 4900 MCF of gas per day. The evidence does not indicate whether the oil produced on this test was from the formation or the oil used in the fracing process.

On March 18, 1959, the Bishop well again was tested for a period of 4 hours. This test was performed by Oklahoma Natural Gas Company, whom lessee had procured as a prospective gas purchaser.

The evidence shows that plaintiff's land is a part of a Skinner Sand oil and gas pool which is a depletion type reservoir with an associated gas cap, the producing energy for oil from the productive zone being supplied by gas. The Skinner pool covers approximately 2 sections of land in Lincoln County. The Bishop well, located in the SW Quarter of 160 acre Bishop tract, a northeast extension of the Skinner pool in which production theretofore had been obtained for producing wells lying to the West, Southwest, and South. The wells in the pool are on 40 acre spacing. The other wells had continuously produced both oil and gas before and after the completion of the Bishop well. The oil from these wells was marketed, but for the reason that no pipeline was available to the field, the gas was flared and wasted. The gas-oil ratio was in most instances of extremely high gas ratio from the other wells (including the offsets). The gas-oil ratio in the other wells was attributable to either the amount of gas sand exposed or their elevation of the structure. The elevation of the Bishop well, and the entire Bishop tract, was higher on the Skinner structure (higher on the gas cap) than were the other wells in the pool.

Lessors, being disturbed by the constant production of the other wells, (which the evidence vividly reflects) intermittently urged Woods to produce and market the oil. Lessors refused to accept checks for "shut-in royalty", which were tendered by Woods. Woods contended the well was a

gas well under the terms of the lease, and that to produce the well would result in waste. Lessors contended the well was an oil well, or not a "well where gas only is found", and that the well should be produced and the oil marketed.

The shut-in royalty provision of the lease in controversy stated:

"In the event that no earned royalty on oil, gas, or casinghead gas is accruing to the lessor under the terms hereof, the lessee shall pay the lessor at the rate of Fifty Dollars ($50.00) per year, payable annually, on each well where gas only is found, and while said gas is not used or sold and during the time said sum is so paid said well shall be held to be a producing well under paragraph two (2) hereof."

Paragraph two provides in part:

" * * * This lease shall remain in force for a term of 5 years from this date (Apr. 10th, 1954) and as long thereafter as oil * * * is produced from said leased premises * * *."

On November 30, 1959, lessor (Bishop), in returning a tendered shut-in royalty check, notified Woods in writing that the lease was then expired.

In February, 1960, due to the intermittent and prolonged urging of lessor (Bishop), Woods commenced producing the well, and continued to do so for six weeks. Production under "choke" during this period averaged approximately 15 barrels of oil per day which was marketed, and approximately 2000 MCF per day which was flared and wasted. We note here that from the time of completion (December, 1958) to the time the well was produced (February, 1960), the "shut-in" pressure of the gas had been reduced on the Bishop well by more than 200 pounds.

After the well was shut in, lessor notified Woods in writing on May 2, 1960, that unless the well was again produced within 90 days the lessor would bring action to cancel the lease.

In July, 1960, an application was filed in the Corporation Commission for unitization and further development of the Skinner Sand common source, of which the Bishop lease was a part. The purpose of the unitization as reflected in the application was that:

"A greater ultimate recovery of oil and gas may be taken therefrom, waste prevented and the correlative rights of the respective owners protected."

We note that both lessors and lessees were in accord with the prudence of the unitization. Prior to filing this application, lessees had used their efforts and cooperation in the preliminary undertakings prerequisite to a unitization program.

In June, 1960 Woods assigned the Bishop lease to Harper and Republic, reserving the Cleveland Sand which, from samples and electric log, had been shown as a prospective oil or gas zone. This zone was not tested from an open hole. This assignment was made with notice to the assignees of lessors' claim that the lease was then expired. In November, 1959, prior to the purchase of the Woods interest, Republic and Harper had acquired the lease interest of the other wells in the area.

The present action was filed in the District Court of Lincoln County on August 16, 1960.

On July 6, 1960, negotiations for a gas pipeline were successful. Effort had been made continuously to market the gas, by lessees and other operators in the field, prior to and after completion of the Bishop well. The first gas was taken from the Bishop lease on August 27, 1960.

Lessors protested the plan of unitization before the Corporation Commission. Their objections were focused upon the participation factor in the unit and were not in opposition to the need for, or prudence of the plan for unitization. Two appeals to this Court arose from the litigation in the Corporation Commission. The cases were consolidated for consideration and the orders of the Corporation Commission were reversed. See Bishop et al. v. Corporation

Commission, Okl., 394 P.2d 235. This Court takes judicial notice of the proceedings therein.

After extensive pleadings the present case came on for hearing on November 20, 1962. The trial consumed 5 days and at the conclusion the trial court announced, in part:

"* * * with three offset wells producing and this well shut in the Court finds that the defendant in operating the lease did not use due diligence in developing and operating the lease, did not operate the lease as a reasonably prudent operator would, and therefore decrees that the lease should be cancelled as of July the 29th, 1960, and enters judgment for the plaintiffs cancelling this oil and gas lease as of that date July 29th, 1960."

The date the trial court cancelled lease was 90 days after (5/2/60) lessors' notice to resume production of lease or cancellation proceedings would commence.

Lessees assign eleven specifications in error, which are presented under six points, or propositions.

■ Points 3, 4 and 5 relied on by lessees indicate this is an equitable action, to which established equitable principles apply. Lessors concede these points drawing, however, a different conclusion. We agree this is an equitable case and that equitable principles should be applied.

■ Point six of lessee's brief expresses concern about possible prejudice to the rights of persons not parties to this action. We dispose of argument by pointing out they are not parties to this action and are not bound by the judgment herein or hereafter declared.

Lessees' remaining points are:

"1. The completion of the Bishop No. 1 well on the leasehold tract within the primary term of the leases made applicable the extended term provisions thereof as the well was properly treated and regarded as a gas well and the leases continued in force until a market was found for the gas producible therefrom.

"2. The completion of the Bishop No. 1 well on the leasehold tract within the primary term of the leases made applicable the extended term provisions thereof, and the shutting in of such well until a market for the gas producible therefrom was found constituted reasonable operations under the circumstances and such lease remained in force and effect."

In examining these contentions it appears that lessees rely upon the express terms of the lease, and argue that the well was a gas well within lease provisions, hence the "shut-in" royalty clause was applicable, or that the primary terms were extended until a gas market was available. Lessors contend the express terms of the lease control; that the well was not a "gas only" well under the "shut-in" royalty provision and therefore the tender or payment of rentals under this provision could not, and did not, extend the primary terms of the lease. Further, since the well did not produce oil from the time of completion in 1958 until February, 1960, the lease specifically terminated under the lease provision contained in paragraph 2, supra.

■ The lease in question was executed on a printed form, commonly known as a Form 88 Special, sometimes used by those engaged in the oil business. After careful examination of this lease, we are convinced, and so hold, that its express terms must be construed in the light of the statutes, which become a part of the lease provision, hereafter more fully discussed.

■ In Bearman v. Dux Oil and Gas Co., 64 Okl. 147, 166 P. 199, this Court said:

"In the construction of contracts, it is the duty of the court to place itself, as far as possible, in the situation of the parties at the time their minds met upon the terms of the agreement, and from a consideration of the writing itself, ascertain their intention, and if this cannot be done from the instrument itself, the circumstances under which it was made, and the subject-matter to which it relates, may be considered, and with these aids, the court should so interpret the contract as to

give effect to the mutual intention of the parties as it existed at the time of contracting, so far as that intention is ascertainable and lawful."

The facts shown by the evidence establish that this was an oil and gas well with a high gas ratio. This Court has never defined these terms in a manner which distinguishes a "gas only" well from an oil well. We are cognizant of the rules of the Corporation Commission which classify wells into categories, but we can receive no benefit from a procedure which was omitted.

The facts show the Bishop well was completed on a gas cap of a depletion type reservoir. The necessary energy to produce the oil from the reservoir was supplied directly by the gas pressure. The evidence shows that reduction of the gas pressure tends to create a vacuum in the structure, which then is filled by the fluid oil into the gas reservoir and the oil so absorbed is not recoverable.

The statutes of this State are specific in regard to waste in connection with production of oil and gas.

52 O.S.1961, § 86.2, in part, reads:

" * * * The production of oil in the State of Oklahoma in such manner and under such conditions as to constitute waste as in this Act defined is hereby prohibited * * *."

And § 86.3, in part, reads:

"The term 'waste', as applied to gas, * * * the production of gas in such quantities or in such manner as unreasonably to reduce reservoir pressure or unreasonably to diminish the quantity of oil or gas that might be recovered from a common source of supply; the escape directly or indirectly, of gas from oil wells producing from a common source of supply into the open air in excess of the amount necessary in the efficient drilling, completion or operation thereof; waste incident to the production of natural gas in excess of transportation and marketing facilities or reasonable market demand; the escape, blowing or releasing, directly or indirectly, into the open air, of gas from wells productive of gas only, drilled into any common source of supply, save only such as is necessary in the efficient drilling and completion thereof; and the unnecessary depletion or inefficient utilization of gas energy contained in a common source of supply. * * *"

17 Am.Jur.2d § 257, at page 654, states in part:

"It is a general rule that contracting parties are presumed to contract in reference to existing law, indeed, they are presumed to have in mind all the existing laws relating to the contract or the subject matter thereof. Thus, it is commonly said that all existing applicable, or relevant and valid statutes, ordinances, regulations, and settled law of the land at the time a contract is made become a part of it and must be read into it, * * *."

Lessee determined that to produce this well for oil would result in waste; that flaring of approximately 2000 MCF gas per day in order to produce 15 to 20 barrels of oil per day was not prudent. The evidence of both the lessees and the lessors corroborate this fact. The probative quality of the evidence of both litigants establishes that the overall, productive reserves of the Bishop lease would have been impaired and wasted by producing the well in the manner urged by the lessor.

Our statute, 15 O.S.1961, § 152, is as follows:

"A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting. * * *"

We are reluctant to construe the lease involved in a manner which would interpret the intent of the parties as being that Woods was required to produce oil and at the same time waste both gas and oil in order to extend the primary terms of the lease while in doing so would have been in direct violation of the statutes of this State.

Paragraph 8 of the lease involved states:

"If prior to the discovery of oil, gas or other hydrocarbon mineral on said land lessee should drill a dry hole or holes thereon or if after discovery of oil, gas or other hydrocarbon mineral all wells thereon, for any cause should become incapable of producing in paying quantities, this lease shall not terminate if lessee commences operations for additional drilling or is reworking or reconditioning any well or wells within sixty (60) days thereafter, or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of sixty (60) days from date of completion of dry hole or cessation of production. If at the expiration of the primary term there is no well upon said land capable of producing oil, gas or other hydrocarbon mineral in paying quantities but lessee has commenced operations for drilling or reworking or reconditioning any well or wells thereon, the lease shall remain in force so long as such operations are prosecuted with no unavoidable cessation of more than thirty (30) consecutive days, and if such operations result in the production of oil, gas or any other hydrocarbon mineral, so long thereafter as any such mineral is produced in paying quantities from said land."

Lessors urge this quoted provision expressly terminated lessee's leasehold interest.

██ A careful reading of this paragraph shows that it concerns a well drilled as a dry hole, or a well that later becomes incapable of producing in paying quantities. In either event the lessee may extend the lease by additional drilling, reworking, or reconditioning. In the present case we are confronted with circumstances involving a well capable of commercial production. The mere fact lessee determined that to produce the oil under the circumstances would result in waste does not render the well noncommercial, or incapable of production, under the express terms of paragraph 8.

Even though we hold the lease did not expire under its express terms, we conclude the issues are determinable under the implied covenants of the lease.

Other than contentions that the lease terminated under express terms of the contract, the lessors argue (as urged in the trial court), that lessees may not take and hold lessors' property in view of lessees' acts, to-wit:

1. By failure to complete, test, produce, protect, operate, drill, and develop in the manner of a reasonably prudent operator.

2. By failing to prove equitable considerations excusing their misrepresentations, and inequitable conduct from bad faith misrepresentations, and defaults, in meeting conditions precedent to extension of their leases.

3. That lessees failed to diligently seek gas market and failed to obtain one within reasonable time.

4. That lessee was obligated to drill additional wells, and also drill or adequately test the Cleveland Sand.

We shall discuss these contentions generally, but with an attempt to keep them in the sequence as above set out.

During the trial lessors presented a great deal of evidence purporting to establish that Woods failed to complete, test, produce and operate the Skinner zone as a reasonably prudent operator. Lessors' expert evidence was that the lower two feet of the Skinner zone first perforated was not properly tested, the test period being insufficient; and, further, that this section should have been sandfraced separately, and Woods was not reasonably prudent in testing this interval before going up the hole to perforate further. Lessors' theory is that in view of the high gas ratio of the field, Woods was imprudent in not attempting to produce from the lowest possible portion of the Skinner in order to increase the oil ratio. Lessors' evidence purported to show that after perforating the next ten foot section of the Skinner, Woods acted imprudently by failing to use proper equipment, which,

if used, would have reduced the gas ratio and thereby increased the oil ratio.

■ Lessees' expert evidence in this regard, was that the bottom two feet perforated was in a section which was low in permeability and in porosity and that it was sufficiently tested; one further reason for perforating and testing this two foot section was to determine whether the cement of the casing was sufficient; that the next interval was perforated in the lower part of the Skinner section because it was determined, from electric logs and core analysis, as being in the proper location for perforating. Lessees' witnesses were cross-examined exhaustively as to what was done in regard to completion, testing and producing. The evidence on the part of lessors at most showed there might have been a better method of completion. The probative value of lessees' evidence does establish that Woods did complete the well according to the judgment of its experts.

■ In Covenants Implied in Oil and Gas Leases, Merrill, (2nd Ed.) § 76, Completion of Well, at page 190, in part, states:

"The duty of the lessee to use reasonable care to complete a producing well, if possible, and to complete it so as to procure the most profitable production, is recognized in the cases. * * *"

At page 192:

" * * * If the situation is one in which the practice of skilled and diligent operators varies, the lessee is entitled to use his own judgment as to which of the recognized methods he will follow."

■ We determine that in the completion of this well Woods was within its prerogatives by acting in reliance upon its own experts. Upon this basis it must be concluded such judgment prevails over the lessors' claim that the well was improperly completed.

■ Lessors' evidence purports to show that Woods should have continued developing the lease; that the Cleveland Sand should have been properly tested and if productive should have been produced; that

another well should have been drilled and gas from the Bishop #1 recycled so as to prevent waste. In reviewing the record we observe that prior to the filing of this lawsuit the lessors' major and prolonged objection was Woods' failure to produce the well and market the oil. His last written notice (5/2/60) in regard to cancelling the lease was because Woods had ceased production a short time prior thereto. Lessors' own expert Witness (S) testified any other well drilled on the Bishop tract would be at a higher elevation in the Skinner Sand, and as a petroleum engineer he would not recommend another location being drilled. Further, the evidence of both parties shows desirability of a unitization plan. The evidence shows efforts being made on the part of the lessees to secure a pipeline, in order to market the gas from the pool. See Ferguson v. Gulf Oil Corp., 192 Okl. 355, 137 P.2d 940. Under these circumstances we necessarily conclude that equity does not dictate forfeiture of the lease upon grounds of Woods' failure to further develop this lease, or for lack of diligence in seeking a gas market.

Relative to lessor's asserted obligation on the part of Woods to drill an additional well in order to recycle the gas from Bishop #1, lessors' evidence does not attempt to demonstrate the practicability or the economic feasibility. Lessors' evidence, and position assumed, attempts to require lessee to test, and if productive, produce from the Cleveland Sand.

Under the facts in this case equity does not require the cancellation of the upper zone (Cleveland). The upper zone was merely speculative in that it had not been tested; nor had production been obtained from this zone in the area. The interest in the Cleveland arose after the well was drilled and the electric log was examined.

Insofar as a duty upon lessee to test and to complete in the Cleveland zone either by going up the hole in the Bishop well from the then completed zone, or drilling an additional well to the Cleveland, can only be imposed by showing probable profitability, and

that lessee has waited an unreasonable length of time after notice by lessor. No effort was made by lessor to show that a reasonably prudent operator would have dually completed in both the Skinner and the Cleveland. Lessor's experts testimony went only to establish that completing in the Cleveland could be accomplished by plugging off the Skinner. We cannot ascertain the reasonableness of lessor's theory to demand that lessee jeopardize the lower zone by further testing up the casing in a speculative zone. Lessors made no attempt to show that the drilling of another well to the Cleveland would result in a commercial producer.

 As we are presently informed this Court has never had before it a case involving a lessee's duty to further test or explore speculative horizons above a then completed productive horizon. We hold that a lessor may not require the testing of or, well completion in an upper horizon, except upon proof that this could be done without undue danger of injury to the production in the already proved lower horizon and that this testing or completion probably would result in profitable production from the upper sand, and to do so would be in the best interest of both the lessee and lessor. We hold, also, that the same principle governs an asserted duty to drill a separate well to the upper zone. Of course, in either instance, the lessor must show that he has demanded a test of the upper zone and has allowed a reasonable time for compliance therewith. Nothing that we have said applies to the extent of the lessee's duty when the production from the lower zone has been exhausted or to the performance of his duty to protect against drainage.

 We now consider lessors' allegations and evidence in regard to lessees' failure to protect the Bishop lease. This appears to be the primary cause of the controversy between the parties. Lessor was convinced the well on his premises was a commercial oil and gas well. He could not understand Woods' failure to produce this well when all other wells in the field were producing. The evidence adequately shows that the Bishop lease was drained of oil and gas. Even though the evidence fails to establish the amount of drainage, the proof of the reduction of the gas pressure between December, 1958, and February, 1960, is sufficient to establish that the reserves under the Bishop tract were depleted by the offsets, and other wells in the pool.

 Merrill, supra, § 94, pp. 234, 235, states:

"If producing wells are drilled upon adjoining lands within draining distance of the line, it behooves the owner of the land to counteract their influence by 'offset' wells upon his premises. But, if his land is covered by an oil and gas lease, the owner himself has no right to drill such wells, even were he financially able to do so. If protection against drainage is to be secured, it must be furnished by the lessee. * * *"

The present fact situation differs from those customarily disclosed in drainage cases, in that we have before us a completed commercial well upon lessor's land which, for reasons heretofore mentioned, lessee refused to produce and as a result drainage occurred. The evidence fairly shows that waste of oil and gas would have occurred had lessee produced this well as lessor urged. However, under the circumstances the evidence also shows this conduct on the part of the lessee resulted in the depletion of the reserves under the Bishop lease.

 We cannot establish a rule which requires the lessee to waste oil or gas in violation of a statute prohibiting waste, merely because drainage is occurring by other operators. On the other hand we cannot overlook lessees' obligation to use every reasonable measure to protect from drainage. The remedy or relief in such a case rests in the Corporation Commission, which is by law delegated to prevent waste and protect correlative rights. We are mindful of the general principle that the obligor under a contract is not compelled to perform under that contract terms when to

do so would be contrary to the law; this is assuming that the obligor is not at fault.

The facts are sufficient in this case to establish that the completed well was an oil and gas well with a high gas ratio. Necessarily, we determine the lessee was acting prudently when he ascertained that it was illegal and improper to flare gas in the quantities shown by the evidence, in order to produce the unallocated allowable of oil. The ensuing question is whether lessee was acting in its own interest and in the interest of the lessors when it permitted the offset wells to flare great quantities of gas while producing oil? We think not. Why lessee acted in this manner is not clear from the evidence. We cannot ascertain its reason. We take judicial notice of the statutes which permit any interested party to seek relief from the Corporation Commission for the protection of his correlative rights. Although both the lessor and the lessee had access to the Corporation Commission for relief, we feel the greater responsibility was with the lessee. The evidence reflects the gas pressure on the Bishop #1 had been reduced appreciably from the time of initial testing until finally put on production. This reduction in pressure indicates that the leasehold had been actually drained either of liquid oil and gas, or loss of gas pressure, which in turn indicates the loss of recoverable oil.

The question then arises as to the extent of lessors' damages which occurred as a result of lessee failing either to produce the well as lessor demanded, or seek relief from the Corporation Commission. Had lessee gone to the Corporation Commission, the relief which would have been accorded appears speculative but in any event the lessee would have exhausted all legal avenues available. On the other hand had the lessee produced the well as lessors urged then lessors maximum loss can be ascertained. Lessors' loss at most can be calculated by determining the oil allowable of this well during the period when lessee determined to shut the well in as a gas well until the time the well was connected to a pipeline; lessor's loss would be his pro rata royalty interest in that amount. In our attempt to balance the equities in this case, we feel the lessors are entitled to no more than they were initially demanding.

It was conceded at oral argument by attorney for lessors that waste occurred when the offset wells were produced. The loss to lessors occurred by the production of the other leases which depleted the reserves under the Bishop tract. Thus, we have loss occurring both to the lessors and the lessees by acts of third parties, (prior to Woods' sale to Harper and Republic). Neither of the litigants profited by Woods' conduct; the loss occurred to both. The record does not show that Woods intentionally created the situation; it does show Woods, faced with a dilemma, did nothing to protect the lease from drainage. In 27 Am.Jur.2d, Equity § 146, at page 682, we find:

"* * * In this respect it is frequently said that where one of two innocent parties must suffer, he through whose agency the loss occurred must bear it. Similarly it is often said that where one of two parties, both guiltless of intentional wrong, must suffer a loss, the one whose conduct, act, or omission occasions the loss must stand the consequences. * * *"

In view of the matters above stated it is apparent the trial court's judgment canceling the lease and purporting to quiet lessors' title was incorrect. The problem arising from this conclusion presents the question as to the nature of the judgment to be entered. As an equitable matter, the result must be determined under equitable principles.

It is axiomatic that equity abhors a forfeiture. 30 C.J.S. Equity § 56 a, c. And, having jurisdiction of the parties to the controversy, a court of equity has power to decide all matters in dispute and decree complete relief, and may accord what otherwise would be legal remedies. Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391. Thus, under the plenary powers of equity, the relief granted may be

adopted to the exigencies of the case. In Foster v. Hoff, 37 Okl. 144, 131 P. 531, syllabus 2 states the principle:

"A court of equity, looking beyond the mere form of things to their substance, has power to decree such relief to the parties as appears just and right, and as best calculated to protect their rights under the situation presented by the record."

Also see Brewer v. Oil Well Supply Co., 126 Okl. 108, 258 P. 866.

Whether considered as a balancing of the equities, or a matter wherein equity is called upon to do complete justice, the result must be a full disposition of the cause as far as possible. The rule generally recognized is when a court of equity once acquires jurisdiction over some portion of a cause, it may, and generally will proceed to determine the whole issues and award complete relief. This is true although the rights of the parties are strictly legal and the ultimate remedy of a kind that can be granted by a court of law. See generally 1 Pomeroy Eq. Jur. (4th Ed.) § 237; Franklin v. Margay Oil Corp., 194 Okl. 519, 153 P.2d 486; Maben v. Norvell, Okl., 328 P.2d 425.

The ensuing question concerns the relief to be accorded in this cause. Generally money damages are not recoverable in an equitable proceeding. However, where equity has assumed jurisdiction of the subject matter it may do complete justice between the parties by retaining the cause, and ordering recovery of compensatory damages only, punitive damages not being the function of equity. Mid-Continent Pet. Corp. v. Bettis, 180 Okl. 193, 69 P.2d 346. As to authority of courts of equity to retain jurisdiction of a cause for purpose of doing complete justice by allowing damages in a proper case see annotations: 35 A.L.R. 396; 147 A.L.R. 660; 156 A.L.R. 1140.

In an equity case this Court will examine the record and weigh the evidence, and, if it is determined the judgment rendered is contrary to law or against the clear weight of the evidence, this Court may render or cause to be rendered the judgment that should have been rendered by the trial court.

The judgment of the district court decreeing cancellation of the lease and quieting lessors' title thereto is reversed. The cause is remanded to the district court with directions to render judgment in favor of the lessors for the pro rata amount of their royalty interest as damages. The amount of damages shall be determined by calculation of the unallocated allowable of the Bishop #1 well from 30 days after November 4, 1958, (the date Woods shut in the well for a gas market) until July 27, 1960, (the date when the gas line connection was made). Costs of appeal borne by lessees (plaintiffs in error).

This opinion is an adjudication in regard to the cancellation of the leases here involved, and a determination of the equities up to and including the rights of the parties at the time of the connection of the Bishop #1 well to a pipeline for a gas market. This opinion does not adjudicate any liabilities or rights which may or may not have arisen thereafter.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, WILLIAMS, HODGES and McINERNEY, JJ., concur.

BLACKBIRD and LAVENDER, JJ., dissent.