Dear Honorable Bingman,
This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
1. The Production Revenue Standards Act ("Act"), 52 O.S. 2001, § 570.1[52-570.1] — 570.15, regulates the marketing, sale and production of oiland gas in Oklahoma. Does Section 570.10(A) of the Act create an impliedtrust which requires any person holding revenue or proceeds of oil andgas production to do so for the benefit of the owner(s) legally entitledthereto (as the term "owner" is defined in Section 570.2(1) of the Act)and to pay such revenue or proceeds to those owner(s)?
 2. Does the person receiving revenue or proceeds of oil and gasproduction have any right, title, or interest in such revenue orproceeds?
Section 570.10(A) of the Production Revenue Standards Act ("Act") provides as follows:
 All proceeds from the sale of production shall be regarded as separate and distinct from all other funds of any person receiving or holding the same until such time as such proceeds are paid to the owners legally entitled thereto. Any person holding revenue or proceeds from the sale of production shall hold such revenue or proceeds for the benefit of the owners legally entitled thereto. Nothing in this subsection shall create an express trust.
Id. To fully answer your questions, it is necessary to determine the intent of the Legislature in drafting the above language. In determining legislative intent, certain general principles of statutory construction apply. First, one must look to its plain wording. City of Durant v.Cicio, 50 P.3d 218, 221 (Okla. 2002). Second, "words, phrases, and expressions [are to] be accorded their ordinary meaning when practical to do so." Seal v. Corp. Comm'n, 725 P.2d 278, 289 (Okla. 1986). Third, it is "important in construing the Legislative intent behind a word to consider the whole act in light of its general purpose and objective, considering relevant portions together to give full force and effect to each." Estes v. ConocoPhillips Co., 184 P.3d 518, 525 (Okla. 2008). Fourth, courts must presume that the "Legislature expressed its intent and intended what it expressed, and statutes are interpreted to attain that purpose and end, championing the broad public policy purposes underlying them." Id. Fifth, a review of a statute's history, and in particular whether a statute amended prior law, may reasonably indicate the Legislature's intent. Irwin v. Irwin, 433 P.2d 931, 934 (Okla. 1965).
 History and Background
In 1992, the Oklahoma Legislature passed Senate Bill 168 regulating the marketing, sale and production of hydrocarbons[1] from Oklahoma wells.See 1992 Okla. Sess. Laws ch. 190. Senate Bill 168 was codified as the Production Revenue Standards Act (52 O.S.Supp. 1992, §§ 570.1[52-570.1] — 570.15) and the Natural Gas Market Sharing Act (52 O.S.Supp. 1992,§§ 581.1[52-581.1] — 581.10). The bill renumbered the statute relating to the sale and production of hydrocarbons from Oklahoma wells from 52O.S.Supp. 1992, § 540[52-540] ("Section 540") to Section 570.10. 1992 Okla. Sess. Laws ch. 190, § 28. The statutes relating to the marketing of natural gas from Oklahoma wells were renumbered from 52 O.S. 1991 Supp. 1992, §§ 541 — 547 (collectively, "Section 541") to Sections 581.2 — 581.10. See 1992 Okla. Sess. Laws ch. 190, § 29.
Senate Bill 168 was drafted and submitted by the Commission on Oil and Gas Production Practices ("Commission"), the creation of which was authorized by the Enrolled Senate Concurrent Resolution No. 108 adopted May 25, 1990 ("Resolution 108"). Resolution 108 provided in part as follows:
 WHEREAS, it is the feeling of the legislative committees and the Office of the Governor that a commission be appointed by the Legislature made up of Legislators, representatives of the natural gas industry, both large and small producers and operators, and mineral owners for the purpose of further studying the issues of natural gas production and sales, revenue distribution, balancing, market access and sharing, and attendant concerns.
 NOW, THEREFORE, BE IT RESOLVED BY THE SENATE OF THE 2ND SESSION OF THE 42ND OKLAHOMA LEGISLATURE, THE HOUSE OF REPRESENTATIVES CONCURRING THEREIN:
 THAT a Commission on Oil and Gas Production Practices shall be appointed to conduct an interim study and review of the oil and gas production practices in the State of Oklahoma.
Id. The Commission was comprised of seventeen (17) members consisting of the Governor's designee, two members of the Senate, two members of the House of Representatives, and twelve citizen members. Id. The citizen members included an equal number of members from the following groups: "major oil companies, independent oil and gas producers, royalty owners and purchasers of oil and gas." Id.
The Commission began its deliberations in July 1990. The Commission's efforts resulted in Senate Bill 168, which was passed by the Legislature and signed into law by the Governor on May 8, 1992. See 1992 Okla. Sess. Laws ch. 190. The statutory history leading up to Section 570.10(A) in its present form confirms that the section has been gradually strengthened over time. Section 540, as the predecessor to Section 570.10(A), provided only that "[t]he proceeds derived from the sale of oil or gas production from any oil or gas well shall be paid to persons legally entitled thereto. . . ." Id. Thus, Section 540 imposed only an affirmative obligation to pay proceeds to "persons legally entitled thereto." Section 540 did not address the issue of the ownership of the proceeds of production while they were in the possession of another person.
Through Senate Bill 168, the Oklahoma Legislature substantially rewrote, strengthened and expanded the scope of Section 540. See 1992 Okla. Sess. Laws ch. 190, § 10 (amending 52 O.S. 1991, § 540[52-540]). The result was Section 570.10 with its present language. See 1992 Okla. Sess. Laws ch. 190, § 28 (recodifying 52 O.S.Supp. 1992, § 540[52-540] to52 O.S.Supp. 1992, § 570.10[52-570.10]). In furtherance of the general regulatory scheme to protect correlative rights, [2] Senate Bill 168 did three principal things in Section 570.10(A):
 1. Addressed ownership of the proceeds of and revenues from the sale of production by stating in unambiguous language that all proceeds of production are separate and distinct from all other funds of the purchaser of that production and any other person receiving or holding those funds.
 2. Addressed the potential situation where proceeds of production might lose their character as property of the owners legally entitled thereto by stating in unambiguous language that all such funds retain their separate identity, character and ownership until they are paid to those owners.
 3. In unambiguous language, imposed an affirmative obligation on any person who has received and is holding the revenue or proceeds to "hold such revenue or proceeds for the benefit of the owners legally entitled thereto."
See 1992 Okla. Sess. Laws ch. 190, § 10 (amending 52 O.S. 1991, § 540[52-540]) (emphasis added) (renumbered to § 570.10, see 1992 Okla. Sess. Laws ch. 190, § 28). These principles were not contained in Section 540prior to 1992.
 Analysis of the Current Statute
Consistent with the general principles of statutory construction, it is important to note that the State of Oklahoma "may adopt reasonable regulation in the exercise of its police power to protect the correlative rights of owners. . . ." Seal, 725 P.2d at 286.
The oil and gas industry in Oklahoma has been the subject of extensive regulation over the years. In fact, the Oklahoma courts have acknowledged such regulation and announced certain fundamental principles relating to the regulation of the oil and gas industry and the protection of correlative rights: (a) the State of Oklahoma has extensively and continuously regulated the natural gas industry, including in the areas of production and purchasing, (b) parties with contracts on these subjects could not have reasonably expected that their contractual rights were immune from alteration by subsequent State regulation, and (c) this is particularly true with respect to legislation that imposes a general rule of conduct for the natural gas industry to protect a broad societal interest such as correlative rights. Id. at 292; see Oryx Energy Co. v.Plains Res. Inc., 918 P.2d 397, 399 (Okla.Ct.App. 1994). In Oryx, the court specifically found that Section 540 (now Section 570.10) was "a general rule of conduct for the oil and gas industry that is designed to protect correlative rights through affirmative requirements for distribution of proceeds from sales of production, including cash balancing upon depletion, and through penalties for violations." Id.
Thus, the requirements for distribution of proceeds from sales of production set forth in the predecessor to the Act were declared to be a general rule of conduct for the oil and gas industry to protect a broad societal interest in the correlative rights of the owners thereof.
Under the principles enunciated in Seal and Oryx, it is reasonable to conclude that the Act is a comprehensive regulatory scheme and sets out general rules of conduct for the oil and gas industry in respect of the payment of proceeds of production from oil and gas wells in Oklahoma, and is designed specifically to protect a broad societal interest in the correlative rights of the owners of that production and the proceeds and revenue therefrom. Included in that comprehensive regulatory scheme and the general rules of conduct is Section 570.10(A), which addresses the ownership of proceeds of production and the payment of those proceeds to the rightful owners. Therefore, in interpreting Section 570.10(A), the section must be considered as an integral part of the general rules of conduct for the oil and gas industry designed to protect the broad societal interest in the correlative rights of the owners thereof.
A consideration of the entire Act leads to the conclusion that Section 570.10(A) is an essential part of the comprehensive regulatory scheme and general rules of conduct established by the Act. The Act establishes a number of obligations in respect of payment of production proceeds from the time the oil and gas is produced until the owners get paid for that production:
 1. Section 570.3 establishes that the Act applies to "all owners" and "all producing wells, regardless of the date pooled, drilled or of the date of the underlying leases[.]"
 2. Section 570.2 defines an "owner" as a "person or governmental entity with a legal interest in the mineral acreage under a well which entitles that person or entity to oil or gas production or the proceeds or revenues therefrom[.]" Thus, an "owner" is not limited to a royalty owner.
 3. Section 570.4(A) communitizes[3] the royalty share in all proceeds derived from the sale of gas production from a well.
 4. Section 570.4 establishes a mechanism for the payment of the communitized royalty share.
 5. Section 570.8(B) deals with the nomination and sale of natural gas from a well.
 6. Section 570.9(A) establishes the rights of an "owner" to produce its interest in monthly production from a well.
 7. Section 570.10(B) establishes the rights of owners in the proceeds of or revenues from the sale of production and the time for payment of those proceeds. These rights are not limited to royalty owners but rather extend to all "owners." If the proceeds are not timely paid to the "persons legally entitled thereto" within the statutory time frames, those "persons legally entitled thereto" are owed interest on "their" money by the delaying party — even if there are title defects which might prevent payment.
Given the principles of statutory construction and that Section 570.10(A) is part of a comprehensive regulatory scheme binding on the oil and gas industry and those dealing with that industry, certain conclusions concerning Section 570.10(A) logically follow.
First, by using the word "shall," the Legislature made the provisions of Section 570.10(A) mandatory ("shall be regarded as separate anddistinct from all other funds" and "shall hold such revenue or proceedsfor the benefit of the owners legally entitled thereto") Id. (emphasis added). Whenever the Oklahoma Legislature uses the term "shall" in a statute, "it signifies a mandatory directive or command." Keating v.Edmondson, 37 P.3d 882, 888 (Okla. 2001). Thus, it is mandatory that the proceeds be regarded as separate and distinct from all other funds of the person receiving or holding those proceeds. Also, it is mandatory that the person receiving or holding those revenues or proceeds hold them for the benefit of the owners legally entitled to them.
Second, since the proceeds are regarded as separate and distinct from all other funds of the person receiving or holding them, and since it is mandatory that the person receiving or holding the revenue or proceeds hold them for the benefit of the owners legally entitled to them, it follows that the person receiving or holding such revenue or proceeds acquires no rights in the revenue or proceeds. The "holding for the benefit of another" principle is at the heart of Section 570.10(A). That principle is analogous to the fundamental structure of a trust relationship; i.e., "a person in whom some estate, interest, or power in or affecting property of any description is vested for the benefit of another." Riedell v. Stuart, 2 P.2d 929, 933 (Okla. 1931) (citation omitted). Under general trust principles, a trustee's interest is a bare legal interest, not entitling the trustee to any benefit or profit from the trust property. George Gleason Bogert George Taylor Bogert, The Law of Trusts Trustees, § 146 (West Publ'g Co.) (rev. 2d ed. 1979). That general principle has been recognized in Oklahoma in the context of implied trusts. Since implied trusts declare actual ownership of property to be in another notwithstanding bare legal title being in the implied trustee, Oklahoma has recognized that liens of third parties against the implied trustee (even innocent third parties) do not attach to the bare legal title held by the implied trustee. As the Oklahoma Supreme Court held in J. I. Case Threshing Mach. Co. v. Walton Trust Co., 136 P. 769, 771
(Okla. 1913):
 The lien of a judgment does not attach to the mere legal title to the land existing in the judgment debtor, when the equitable and beneficial title is in another, and a transitory seisin of lands by the judgment debtor, in trust for another, will not subject the lands to the lien of a judgment. This rule applies where the judgment debtor, although having the legal title to the lands, holds it subject to a resulting trust in favor of another. A judgment is a lien only on the interest of the debtor, whatever that may be; therefore, though he seems to have an interest, if he had none in fact, no lien can attach.
Id. (citation omitted). However, the foregoing does not end the analysis. The issue remains as to the implementation of the clear legislative intent of Section 570.10(A). Since the language of the section embodies trust concepts (i.e., holding the proceeds for the benefit of the persons legally entitled to them), the question is whether Section 570.10(A) does, in fact, create a trust relationship between the holder of the proceeds and the persons legally entitled to those proceeds.
There are two types of trusts recognized in Oklahoma: express trusts and implied trusts. An express trust contemplates an affirmative expression by a settlor, such as a written trust agreement. "Implied trusts are those which, without being expressed, are deducible from the nature of the transaction as matters of intent, or which are [added to] the transaction by operation of law as matters of equity." Teuscher v.Gragg, 276 P. 753, 756 (Okla. 1929). Implied trusts in Oklahoma are further divided into two categories — resulting trusts and constructive trusts. Id. Cacy v. Cacy, 619 P.2d 200, 202 (Okla. 1980), describes the differences between resulting and constructive trusts as follows:
 Although constructive and resulting trusts are each remedial because they prevent the wrongful taking and holding of the property, these trusts are distinguishable. The distinction in the case of a resulting trust lies upon the doctrine of valuable consideration and not upon legal title. A constructive trust primarily involves the presence of fraud, which requires that the equitable title be recognized in one other than the legal title holder.
 . . . .
 The primary reason for imposing a constructive trust is to avoid unjust enrichment. . . . It is imposed against one who by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.
Id. (footnote omitted).
The distinction between express and implied trusts was recognized by the Oklahoma Supreme Court in Bryant v. Mahan, 264 P. 811, 812 (Okla. 1927):
 To constitute an express trust there must be some act on the part of the cestui que trust expressive of an intent to create a trust and to designate some one as trustee. A resulting trust arises where, from the condition of facts existing, regardless of any intent on the part of the beneficiary, the law presumes a trust.
Id. (emphasis added) (citation omitted). The equity rule is that:
 "Express trusts" — are generally created by instruments that point out directly and expressly the property, persons, and purpose of the trust; hence they are called direct or express trusts, in contradistinction from those trusts that are implied, presumed, or construed by law to rise out of the transactions of the parties.
Id. (citation omitted). In fact, the courts have recognized that an implied trust may exist where an express trust could not exist. As the court stated in Childers v. Breese, 213 P.2d 565, 567 (Okla. 1949):
 A resulting trust is one of the classes of trusts, which arise by operation of law and may exist where an express trust could not exist, since it may arise without being created in writing, being based upon presumption or inference of law and not upon expression of the trustor's intention.
Id. Therefore, under the principles of statutory construction set forth above, Section 570.10(A) does not create an express trust, because Section 570.10(A) expressly negates the existence of an express trust. However, since by its terms, Section 570.10(A) negates only an express trust, the question remains as to whether Section 570.10(A) results in the imposition of an implied trust as a matter of law, by which the law recognizes that the person receiving or holding the proceeds of production has no rights in the revenue or proceeds and imposes on that person the obligation to pay the revenue or proceeds to the owners legally entitled to them. The question has two components: (1) whether the statutory language excluding an express trust in the statute also excludes the imposition of an implied trust, and (2) if not, whether the section satisfies the elements of an implied trust. These issues are addressed in order below.
Given that the differences between an "express" trust and an "implied" trust have been long recognized and settled by the Oklahoma courts, those terms would have been readily understood by the Legislature when it enacted Section 570.10(A). As to whether specifically negating an "express trust" also negates an implied trust, settled principles of statutory construction prohibit reading such an interpretation into Section 570.10(A). It has long been the rule in Oklahoma that where a statute is plain and its manifest intention and purpose is clearly shown by its language, a court may not give the statute a different meaning. As the court held in Atchison, T. S. F. Ry. Co. v. Myers, 246 P. 395, 396
(Okla. 1926):
 The language of the act is such that it affords no room or opportunity for judicial construction. Its meaning is self-evident, and therefore it sufficiently conveys its own meaning and terms, and we do not feel that we would be justified in attempting to read into the statute any other language in order to determine a different result than which is naturally to be deduced there from.
Id. A statute plain on its face may not be added to or expanded under the guise of statutory interpretation. In Edmondson v. Pearce, 91 P.3d 605, 640
n. 48 (Okla. 2004), the court opined:
 [A] statute should not be construed any more broadly or given any greater effect than its terms require. Where the language of the statute is clear in limiting its application . . . and leaves no room for doubt as to the intention of the legislature, there is no authority to transcend or add to the statute, [and the statute] may not be enlarged, stretched, or expanded, or extended.
Id. (citation omitted). Consequently, since there is and has been a long-standing and universal distinction in Oklahoma jurisprudence between express trusts and implied trusts, there is nothing ambiguous about the phrase "express trust" when used in Section 570.10(A). If the Legislature had intended to negate all manner of trusts (including implied trusts), it could easily have done so by not using the word "express" or by employing language such as, "Nothing in this subsection shall create a trust of any nature." The principles of statutory construction in Oklahoma preclude any attempt to expand or rewrite the term "express trust" to mean or include implied trusts. In fact, without the imposition of an implied trust, Section 570.10(A) is nothing more than a hollow statement of intent without an enforcement mechanism. Therefore, the conclusion is compelling that the Legislature intended an implied trust under Section 570.10(A). The question follows as to the nature of the implied trust created — a resulting trust or a constructive trust.
A resulting trust may be presumed to exist where the intent appears or is inferred from the accompanying facts and circumstances that the beneficial interest is not to be enjoyed with the legal title. Trimblev. Boles, 36 P.2d 861, 863 (Okla. 1934). Intention and consideration are essential elements of a resulting trust. Id.; Cacy, 619 P.2d at 202. Intent can be actual or implied from the nature of the transaction and the facts surrounding it. Cacy, 619 P.2d at 202-03. Fraud is not an essential element in establishing a resulting trust. Trimble,36 P.2d at 864; Cacy, 619 P.2d at 203.
Perhaps the most complete statement of Oklahoma law on resulting trusts is in Littlefield v. Roberts, 448 P.2d 851, 856 (Okla. 1968):
 Resulting trusts are those which arise where the legal estate in property is disposed of or acquired, not fraudulently or in violation of any fiduciary duty, but the intent appears or is inferred from the terms of the disposition, or from accompanying facts and circumstances, that the beneficial interest is not to go to or be enjoyed with the legal title. In such a case, a trust is implied or results in favor of the person for whom the equitable interest is assumed to have been intended, and whom equity deems to be the real owner.
Id. Since the primary element of a resulting trust is intent, Section 570.10(A) provides the intent of the transaction by which the production was or would be purchased. This is so because Oklahoma has long held that contracting parties are presumed to contract in reference to existing law and that all applicable statutes existing at the time the contract is entered into become part of the contract. As the Oklahoma Supreme Court held in Sinclair Oil Gas Co. v. Bishop, 441 P.2d 436, 438
(syllabus ¶ 2) (Okla. 1967):
 The general rule is that contracting parties are presumed to contract in reference to existing law, and are presumed to have in mind all the existing laws relating to the contract or the subject matter thereof; thus, all existing applicable, or relevant and valid statutes, ordinances, regulations, and settled law of the land at the time a contract is made become a part of it and must be read into it. . . .
Id. This principle was upheld as recently as this year in Estes,184 P.3d at 526 ("every person is presumed to know the law"). Oklahoma also has long adhered to the principle that non-resident contracting parties are charged with constructive knowledge of the law of the state in which the non-resident transacts business. See Klein v. Keller,141 P. 1117, 1118 (Okla. 1914). The consideration element of a resulting trust is satisfied by the sale of production as described in Section 570.10(A).
This rule has particular application where the law relates to rights in real property within the State. For example, "[p]arties dealing with real estate and titles thereto are charged with notice of the tax liens created by law." Leyh v. Glass, 508 P.2d 259, 263 (Okla. 1973). Moreover, as the Oklahoma Supreme Court held in Hladik v. Lee,541 P.2d 196, 198-99 (Okla. 1975), parties to an oil and gas lease are presumptively aware of the powers of a regulatory agency over the subject matter of the lease:
 The statute indicates the [Corporation] Commission may exclude lands from the spacing unit on grounds common source of supply does not underlie such lands.
 Also, it indicates [the] Commission may limit size of spacing unit on ground one well will not effectively drain larger tract, and larger drilling and spacing unit might not assure maximum ultimate recovery of minerals.
 . . . .
 It [the statute] was in effect at time Hladiks executed the lease. We must presume that at that time parties to [the] lease were aware of Commission's authority to create spacing unit covering part of lands and formation included in declared unit created by lessee.
Id. (citations omitted).
The language of Section 570.10(A) clearly supports the imposition of a resulting trust by which the holder of the proceeds of production is the resulting trustee that holds those proceeds for the resulting beneficiaries; i.e., the persons legally entitled to them. However, further analysis reveals that Section 570.10(A) also imposes a constructive trust on such proceeds. The primary reason for imposing a constructive trust is to avoid unjust enrichment. The most comprehensive definition of a constructive trust is found in Cacy, 619 P.2d at 202:
 A constructive trust . . . is imposed against one who by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. One obtaining legal title to property by fraud or by violation of a confidence or fiduciary relationship, or in any unconscionable manner, can not equitably retain title.
Id. (footnote omitted). Section 570.10(A) declares that proceeds from the sale of production shall be the property of the owners legally entitled to them. Section 570.10(A) directs that the holder of the revenue or proceeds hold them for the benefit of those legally entitled to them. If a holder of the revenue or proceeds tried to exercise ownership of or rights in the revenue or proceeds for the holder's benefit, or the benefit of others who were owners not legally entitled to the revenue or proceeds, such conduct would be in direct disregard of the statutory language and the duties imposed by the section and hence would be "unconscionable" and against "equity and good conscience." It would be against equity and good conscience for the holder to hold the revenue or proceeds of production and not pay them to the owners legally entitled thereto in violation of the statute.
Additionally, not enforcing Section 570.10(A) through the imposition of a constructive trust would promote unjust enrichment. It would give the holder of the revenue or proceeds both legal and beneficial title to and use of property of others not only in violation of law, but also for which the holder had not paid. Thus, the holder of those proceeds would obtain legal and beneficial title to the property of others in violation of State law and at the actual expense of those who sold presumptively in reliance on the State law. Consequently, if Section 570.10(A) were found not to create a resulting trust, Section 570.10(A) would impose a constructive trust on the holder of such funds.
 It is, therefore, the official Opinion of the Attorney General that:
 The Legislature intended an implied trust (whether resulting or constructive) under the provisions of Section 570.10(A) of Title 52. See Cacy v. Cacy, 619 P.2d. 200, 202 (Okla. 1980); Littlefield v. Roberts, 448 P.2d 851, 856 (Okla. 1968); Bryant v. Mahan, 264 P. 811, 812 (Okla. 1927). Furthermore, the holder of the revenue or proceeds of oil and gas production is an implied trustee who has no rights in or to such revenue or proceeds and who is under a statutory duty to pay the revenue or proceeds of oil and gas production to the implied beneficiaries; i.e., the owners legally entitled thereto. The holder of the revenue or proceeds of oil and gas production acquires no right, title or interest in such revenue or proceeds.
W. A. DREW EDMONDSON Attorney General of Oklahoma
TOM BATES Assistant Attorney General
[1] Hydrocarbons are organic compounds found in petroleum, natural gas, and coal. Websters Third New International Dictionary 1108 (3d ed. 1993).
[2] The term "correlative rights" means "those rights which one owner possesses in a common source of supply in relation to those rights possessed by other owners in the same common source of supply [which is] the underlying geological strata from which the oil and gas is produced, rather than the well through which the oil and gas is reduced to possession." Seal, 725 P.2d at 287 (citation omitted).
[3] "Communitize" or "communitization" are terms specific to the area of oil and gas law, and refer to the bringing together of smaller tracts in order to create a tract of sufficient size for the granting of a well permit under applicable rules for the spacing of wells. See LandownersOil, Gas Royalty Owners v. Corp. Comm'n, 415 P.2d 942, 948 (Okla. 1966). *Page 1