Dennis E. SEAL, Darlene C. Seal, Donald D. Seal, Pamela Upchurch, Sueellen Farris, Farmers United Cooperative Pool, Western Oklahoma Royalty Association, J. Cooper West, Neva L. Harris, Hugh Howard Walsh III, A.R. Heiman, Shelby Snider Corporation, R.C. Bradley, Trustee for the R.C. Bradley Revocable Trusts, F.M. Tarpley, Trustee for the F.M. Tarpley Revocable Trusts, Gordon R. Brechiesen, A.E. Martin, Amory Corporation, George Gallesty, Gallesty Oil Properties, Inc., Fuller Petroleum, Inc., Carl A. Neilson, Elsie M. Elder, Nancy Delong Machino, G.M. Tapp and Albert B. Tapp, Appellants,

v.

The CORPORATION COMMISSION of the State of Oklahoma, Appellee.

AMERADA HESS CORPORATION, Amoco Production Company, Apache Corporation, Atlantic Richfield Company, Cities Service Oil and Gas Corporation, Devon Energy Corporation Energy Reserves Group, Inc., El Paso Exploration Company, Exxon Corporation, Getty Oil Company, Grace Petroleum Corporation, Gulf Oil Corporation, Inexco Oil Company, Kerr-McGee Corporation, Kirby Exploration Company, Mapco Production Company, Marathon Oil Company, Monsanto Oil Company, Mustang Production Company, Phillips Petroleum Company, Samedan Oil Corporation, Santa Fe Energy Company, Shell Western E & P Inc., Sun Exploration and Production Company, Tenneco Oil Company, and Texaco Inc., Appellants,

v.

The CORPORATION COMMISSION of the State of Oklahoma Composed of The Honorable Hamp Baker, Chairman; The Honorable Norma Eagleton, Vice Chairman; and The Honorable James B. Townsend, Commissioner, Appellees.

Nos. 61636, 61652.

Supreme Court of Oklahoma.

June 17, 1986.

As Amended Sept. 9, 1986.

Rehearing Denied Sept. 10, 1986.

Tomerlin, High & High by David High, Delmer Stagner, Durbin, Larimore & Bialick by James K. Larimore, Oklahoma City, for appellants Dennis E. Seal, et al.

James H. Bailey, General Counsel, Gretchen P. Hoover, Deputy General Counsel, Patrick W. Willison, Asst. General Counsel, Oklahoma Corp. Com'n, Oklahoma City, for appellee.

McAfee & Taft by Stanley L. Cunningham, Laurence M. Huffman, Philip D. Hart and Gary W. Catron, Oklahoma City, for appellants Amerada Hess Corp.

Emery McCandless & Gaitis, P.C. by Neal A. Gerstandt and James M. Gaitis, Oklahoma City, for appellant El Paso Exploration Co.

Pray, Walker, Jackman, Williamson & Marlar by Bland Williamson, Tulsa, for amicue curiae Oklahoma Independent Petroleum Ass'n.

HODGES, Justice.

This consolidated appeal presents to this Court issues regarding the constitutionality of 52 O.S.Supp.1983 §§ 541–547 (Act) and the validity of Rules 6–100 through 6–113 (Rules) promulgated by the Oklahoma Cor-

poration Commission (Commission) in Order No. 250466.

Appellants Amerada Hess Corporation, et al. (collectively Amerada) challenge the constitutionality of both the Act and the Rules. The major thrust of Amerada's arguments is twofold: (1) the Act and Rules are not a valid exercise of the state's police power and are thus violative of the due process provisions of the Constitutions of the United States and Oklahoma, and (2) the Act and Rules interfere with contractual rights and obligations under the federal and state constitutions.

Appellants Dennis E. Seal, et al. (collectively Seal) challenge the validity of the Rules only, maintaining they are contrary to and inconsistent with the purpose and intent of the Act and constitute a taking of property without due process of law.

The Commission asserts the Act and Rules are constitutional and are in furtherance of a legitimate public interest and are hence a proper exercise of the State's police power.

## I.

### STANDING

■ Before we discuss the merits, we must address Seal's argument concerning Amerada's standing to challenge the constitutionality of the Act. Seal contends that Amerada lacks standing because Amerada is deprived of no constitutional right as the Act requires it to do what courts of equity would require it to do in individual actions where an imbalance has occurred.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[1] The standing doctrine encompasses several limits on the exercise of jurisdiction. At a minimum, standing is not established unless a plaintiff has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends...."[2] The "personal stake" element is met if the plaintiff seeking redress has suffered, or is threatened with, some "distinct and palpable injury"[3] and if there is some causal connection between the alleged injury and the actions being challenged.[4] Because we conclude Amerada alleges a direct and pecuniary injury, and it seeks to protect its proceeds of sales from the purported illegal effect of the Act and Rules thereunder, we find Amerada has standing to challenge the constitutionality of the Act and Rules.

## II.

### THE ACT

The public policy considerations prompting the challenged legislation were first discussed in a concurrent resolution, S.C. Resolution No. 7 entitled "Oil and Gas—Sales—Discrimination," passed by the Senate on February 22, 1983, and by the House of Representatives on March 1, 1983, and filed with the Secretary of State on March 2, 1983. The findings set forth in the resolution are as follows:

"WHEREAS, the State of Oklahoma has the right under its police powers and conservation authority to protect the citizenry of this state from losses by reason of discrimination; and

"WHEREAS, many mineral owners and participants in oil and gas well drilling projects are being discriminated against in the sale of the production of their wells in that purchases are being made from one co-owner as against another; and

1. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

2. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

3. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Independent*

*School Dist. No. 9 v. Glass,* 639 P.2d 1233 (Okla. 1982).

4. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

"WHEREAS, such inability of each co-owner to sell the production from a well may result in the Corporation Commission shutting-in such well to protect individual rights and correlative rights; and

"WHEREAS, when many wells are placed into production, the pro rata share in the net revenue of many owners, including those with working interests, overriding royalties and mineral interests is not being respected and paid; and

"WHEREAS, the net effect of such predatory practices in the sale of well production will cause financial distress to the smaller co-owners; and

"WHEREAS, the inherent wealth of the great lands of Oklahoma is being divested from its rightful recipients; and

"WHEREAS, the continuance of discriminatory purchases and the dishonor of rightful pro rata shares in the production proceeds of many wells in Oklahoma will have serious effect upon the economic health of the State of Oklahoma." [5]

On May 3, 1983, Governor George Nigh signed into law Enrolled House Bill No. 1221, codified as 52 O.S.Supp.1983 §§ 541–547. The Act which became effective immediately is expressly intended to address the protection of "the rights and correlative rights of all interest owners of natural gas wells and wells producing casinghead gas and to afford all such owners an equal opportunity to extract their fair share of gas and to sell and be paid in proportion to their interest therein." The Act is further expressly intended "to protect such owners against discrimination in purchases in favor of one owner as against another." [6]

Under Section 542, whenever a well is placed into production, all owners are entitled to share ratably in the revenues from the sale of production. Prior to the date of first production, the operator of the unit area must offer each owner of the well an election whereby the operator seeks to market that owner's ratable share of production or a designated portion thereof. In the event the owner so elects, the operator

shall seek to market the owner's share at the best price and terms available in the area but not at a price or terms less favorable than those received by the operator. Each electing owner has 30 days within which to reject the offer but the owner's failure to reject is deemed an acceptance thereof. If no offer to purchase is secured within 120 days of an election the owner may rescind the election in writing. If an owner does not exercise the election, the owner is not obligated to deliver his ratable share for sale nor is the operator obligated to market such share. The Act does not prevent each owner from receiving the price agreed upon by contract and from taking his share of production in kind or separately disposing of his share.

Section 543 provides that if an electing owner receives a contract for sale of only his portion of production, the other electing owners having no contract are entitled to share ratably in the revenue from the contract "to the extent of their net revenue interest." Each electing owner receiving a contract to sell must give written notice to all other net revenue owners without a contract for the purchase of their share.

Section 544 provides that the amount of gas produced daily from a well is owned by each owner in the well in proportion to each owner's interest in the well, irrespective of which owner actually produces the gas. Each owner producing and selling or disposing of gas separately must account to the other owners not selling or otherwise disposing of gas and compensate them for their proportionate part of the gas disposed of or sold.

Section 545 provides that distribution of revenue from the sale of production be made pursuant to 52 O.S.Supp.1985 § 540. Additionally, any owner receiving revenues directly from the purchaser must forward the same to the party responsible for distribution under Section 540.

Section 546 states that the Act shall not be construed as setting or restricting the

5. 1983 Okla.Sess.Laws 1172–1173.

6. 52 O.S.Supp.1983 § 541.

price, terms or conditions under which a purchaser takes the production of a well; requiring any purchaser to connect any well that it is not already obligated to connect; and altering or changing the legal definitions of common purchaser and common carrier.

Section 547 empowers the Commission to promulgate rules and regulations for implementing the Act, including the power to establish and enforce penalties for violations thereof. It provides that such power does not preclude the remedies available through the district courts nor preclude any owner from recovery of treble damages and attorneys fees.

Oklahoma law has historically required ratable taking from a common source of supply.[7] In *Inexco Oil Co. v. Corporation Commission*, 628 P.2d 362, 364 (Okla. 1981), this Court observed in connection with a discussion concerning ratable taking in a common source of supply under 52 O.S.1981 §§ 23 and 24.1:

"The basis for the enactment of Oklahoma's oil and gas conservation laws is to protect correlative rights. The purpose of the regulatory scheme concerning common carriers and common purchasers of gas is to afford the producers of a common source of supply and equal opportunity to market and transport oil and gas from their wells." (Footnotes omitted).

The Act differs with all previous legislation in that it is directed towards producers rather than purchasers and towards co-owners within a single well as opposed to owners of interests between wells in a common source of supply. Moreover, the Act entitles each owner to share ratably in the revenues generated by the sale of production and creates a type of cotenancy property interest in such proceeds.

Prior to the passage of the Act, serious problems beset the gas industry in the State of Oklahoma. In the early 1980s discriminatory practices resulted from a surplus in deliverability of natural gas. Pipelines had burdensome contractual obligations to take gas which greatly exceeded their ability to market. This circumstance caused pipelines to either ignore their contractual obligations to take under existing contracts or exercise their options to "market out." Additionally, with regard to the acquisition of new gas reserves, they would enter into contracts with some producers and refuse to contract with other working interest owners within the same well. Non-contracting owners were generally unable to obtain a gas purchasing contract for their gas due to the surplus. Thus purchasers could take as much gas as desired from a well with only a contractual obligation to favored producers.

The industry employed the use of gas balancing contracts either contained in joint operating agreements, or otherwise, which attempted to protect rights of non-selling working interest owners by providing that their pro rata share of the gas would be balanced when the reserves were depleted. This gas balancing arrangement customarily would not afford any interest on delayed income. The non-selling owners were denied the use of these funds and moreover, there was no guaranty that the selling owners who received more than their pro rata share of proceeds would be capable, regardless of the obligation, to satisfy their liabilities after balancing of rights. All interest owners in a well would have paid their proportionate share of the drilling and completion costs of production;

---

7. 52 O.S.1981 §§ 23–25 (enacted 1913) (creates status of common purchaser and common carrier and imposes requirement of ratable taking); 52 O.S.1981 §§ 233–235 (enacted 1913) (requires any person taking gas from a gas field to take ratably from each owner of the gas in proportion to his interest in said gas); 52 O.S.1981 §§ 236, 237 and 239 (enacted 1915) (directs Commission to preserve rules and regulations for taking of gas from common sources of supply so as to prevent waste, protect interest of public, and of all those having a right to produce therefrom, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another); 52 O.S.1981 §§ 240 and 242 (enacted 1915) (authorizes Commission to make regulations for delivery, metering and equitable purchasing and taking of gas).

however, because purchasers would not take ratably from all owners, non-selling owners would not immediately receive their share in the proceeds from the well. Consequently, non-selling working interest owners would be unable to pay excess or overriding royalties to their lessees until such time as the provisions of their relevant gas balancing agreements come into effect. Under gas balancing agreements, payment of the proceeds to the non-selling owners would be deferred in many instances until the depletion of the well if the owners were unable to find a purchaser as opposed to payment as and when the production was taken from the well.

The Act addresses these kinds of abuses in the industry by providing for immediate balancing of all proceeds of production from a single gas well from the date of first production on and after the effective date of the Act. It gives the right of ownership of interests in a gas well ratably to each co-owner in the proceeds generated by a well's production as of the moment the gas is reduced to possession consistent with the well recognized principle of the law of capture which is founded on the concept of animals *ferae naturae, i.e.,* property rights in animals are not acquired until the owner reduces them to possession by capturing them.

## III.

### POLICE POWER

The threshold question before the Court, which is the common thread in Amerada's challenge to the legislation on both grounds of constitutional due process and restrictions on laws which impair the obligation of contracts is: Whether the Act constitutes a proper exercise of the police power of the State. As previously noted the expressed legislative intent is to protect the rights and correlative rights of all interest owners of wells, afford all owners an equal opportunity to extract and sell their share of gas and protect all owners against gas purchase discrimination. The focus of Amerada's argument is that the State is limited to affecting rights only as they relate to co-owners in a common source of supply relative to separate wells as distinguished from co-owners in a single well. And, the Act by requiring one producer to share his market with other owners in a well does not operate to serve the expressed legislative intent.

It is well settled that the State may adopt reasonable regulation in the exercise of its police power to protect the correlative rights of owners through ratable taking.[8] "Such legislation does not infringe the constitutional inhibitions against taking of property without due process of law, denial of the equal protection of the laws, or taking property without just compensation."[9] Amerada asserts the Act does not involve correlative rights urging a definition of such as those rights existing between owners of interests in a common source of supply while excluding owners of

---

**8.** *Cities Service Gas Co. v. Peerless Oil & Gas Co.,* 203 Okl. 35, 220 P.2d 279, 285, *aff'd,* 340 U.S. 179, 185, 71 S.Ct. 215, 219, 95 L.Ed. 190 (1950); *Patterson v. Stanolind Oil & Gas Co.,* 182 Okl. 155, 77 P.2d 83 (1938).

It is provided in Summers, Oil and Gas § 75.3 (Perm.Ed.1962):

"If permeability is high in the common source of supply of gas, a few operators may effectively drain much of the field. When sufficient reserves have been established to attract a pipeline into the field, the pipeline purchaser is in a position to take most of the gas from a few favored producers. Further, the law of capture makes it possible for a vertically integrated pipeline company to produce gas from its own selected properties and to drain much of the gas from the field without purchasing any gas from other owners. Either situation is conducive to waste above ground in that owners who are not favored are likely to seek or accept opportunities to market the gas for purposes which constitute a waste of valuable energy. The situation is also conducive to waste below the surface in that development wells will not be properly drilled to achieve the maximum in ultimate recovery. Ratable take and common purchaser orders have the common effect of preventing discrimination in carrying and purchasing gas, but the ultimate purpose is to prevent waste and to protect correlative rights."

**9.** *Anderson-Prichard Oil Corp. v. Corporation Commission,* 205 Okl. 672, 241 P.2d 363, 372 (1951).

the same interests within a well, citing *United Petroleum Exploration, Inc. v. Premier Resources, Ltd.*, 511 F.Supp. 127 (W.D.Okla.1980). In *Tenneco Oil Co. v. El Paso Natural Gas Co.*, 687 P.2d 1049, 1053 n. 11 (Okla.1984), a case dealing with the Commission's subject-matter jurisdiction, we accepted the refinement to our definition [10] of correlative rights by the United States District Court in *United:*

> "[C]orrelative rights are those rights which one owner possesses in a common source of supply in relation to those rights possessed by other owners in the same common source of supply [which is] the underlying geological strata from which the oil and gas is produced, rather than the well through which the oil and gas is reduced to possession." [11]

In the text of the opinion it was stated in connection with a discussion of proper subjects for private contract: "This is not to say that the rights to produce the designated quantity of hydrocarbons from *the well* and the division thereof, *the public interest*, and the owner-operator interests are not the proper subject of a private contract." 687 P.2d at 1053 (Emphasis added).

In *Samson, supra*, this definition was reiterated again in connection with the determination of the Commission's valid exercise of subject-matter jurisdiction to protect correlative rights "in situations in which a conflict exists which actually affects such rights within a common source of supply and thus affects the public interest in the protection of production from that source as a whole." There, this Court found an interest owner's request to be designated as unit operator, displacing the unit well operator under a voluntary agreement, did not concern a dispute in which the public interest in correlative rights was involved. We stated the basis for the interest owner's argument did not "truly concern the disproportionate taking of gas from a common source of supply, as it has attempted to so characterize its argument."

We do not believe the newly refined definition of correlative rights adopted in our recent pronouncements regarding the Commission's subject-matter jurisdiction, inhibits the State's police power to protect correlative rights in the challenged Act.

In *United*, the federal court in addressing an interest owner's assertion that another owner/operator's over-production of gas in a well had damaged its correlative right to production, stated the alleged imbalance was "in large measure, a fiction." It noted the dispute was not whether the operator's actions in reducing to possession a quantity of gas had resulted in a hampering of the owner's ability to conduct its own operation to obtain possession of a quantity of gas from the same supply source; but rather, it revolved around whether the owner of the producing gas well could disclaim title to that portion of the production occurring while it was physically unable to take possession of its fair share, and assert instead an absolute ownership over a mathematically balanced volume of production *after* possession capability was provided. The court determined the equitable considerations required immediate cash balancing rather than a balancing in kind. Although *United* dealt with balancing the production of gas between co-owners in a single well, an infringement upon the correlative rights did not exist. The particular circumstances presented there were the co-owner had refused an immediate cash balancing tendered by the operator in anticipation of the existence of a split stream connection in the near future. The co-owner refused the only viable method of balancing then available. Doubtless the co-owner's correlative

---

**10.** *Kingwood Oil Co. v. Corporation Commission*, 396 P.2d 1008, 1010 (Okla.1964):

"The term 'correlative rights' has been defined as a convenient method of 'indicating that each owner of land in a common source of supply of oil and gas has legal privileges as against other owners of land by lawful operations conducted on his own land, limited, however, by duties to other owners not to injure the source of supply and by duties not to take an undue proportion of the oil and gas.' Summers, Oil and Gas, Vol. 1, Sec. 63."

**11.** *See also Samson Resources Co. v. Corporation Com'n*, 702 P.2d 19, 22 (Okla.1985).

rights were not injured. *United* is inapposite to the current controversy. Consequently, the discussion of correlative rights in that case has no bearing on the present perceived abuse in the industry as addressed in the challenged Act.

■ We do not read *United* to hold, as Amerada contends, that correlative rights never exist among owners of a single well. In our opinion unless all owners in a well have equal opportunity to sell gas from the well, they are not afforded the opportunity to produce their just and equitable share of the gas. The purpose of the Act is to afford this opportunity. Viewed in this light, there is no doubt that the Act protects correlative rights.

■ It should be noted at this point that the rule of judicial construction requires us to look to the legislative intent as manifested from all parts of the Act, being mindful that whenever reasonably possible, a statute must be so construed as to uphold its validity.[12] The Legislature may regulate a business affected with a public interest for the protection of the general welfare, and every possible presumption is to be indulged in favor of the correctness of its finding.[13] We find the purpose of the Act is a proper function of the Legislature under its police power.

## IV.

### DUE PROCESS

■ Amerada contends the Act denies due process of law in violation of the federal and state Constitutions.[14] Under this proposition it argues (1) the Act constitutes a taking of property for private use, (2) the Act changes accrued rights under spacing and pooling orders of the Commission and (3) the Act is unconstitutionally vague.

**12.** *Skinner v. State,* 189 Okl. 235, 115 P.2d 123, 126 (1941).

**13.** *Semke v. State ex rel. Okl. Motor Vehicle Com'n,* 465 P.2d 441, 445 (Okla.1970).

**14.** U.S. Const. amend. 14; Okla. Const. art. 2 §§ 2, 7 and 23 and art. 5 § 54.

**15.** It is provided in 15 O.S.1981 § 29:

In connection with its first argument, Amerada asserts the Act creates an unintended third party beneficiary contract. Amerada cites 15 O.S.1981 § 29[15] in support of this argument. We are not persuaded by this assertion. Although a purchaser may be held liable for conversion if the purchaser has notice that the non-contracting party has rescinded the operator's authority to dispose of his gas, 1 Kuntz, *Oil and Gas* § 11.2, at 242–43 (1962), the Act does not entitle a non-contracting owner to sue on another owner's contract with a purchaser. The Commission correctly maintains the benefit to the non-contracting party arises incidentally to the performance of the contract due to the rights created by the Act.

■ The core of Amerada's due process argument is that the Act does not serve any public purpose. Our foregoing view of this issue disposes of this argument. In *Cities Service Gas Co. v. Peerless Oil & Gas Co.,* 340 U.S. 179, 185, 71 S.Ct. 215, 219, 95 L.Ed. 190 (1950), the United States Supreme Court stated the challenger's argument regarding similar ratable take provisions as to due process was "virtually without substance." The Court upheld the contested order reasoning that it is "undeniable that a state may adopt reasonable regulations to prevent economic and physical waste of natural gas." The standard applied was that such regulations be "substantially related to a legitimate end sought to be attained." [16]

In applying this standard to the present case, we find the means employed by the Act are substantially related to the legitimate end of protecting correlative rights. The measure of reasonableness of the Act enacted under the State's police power is

"A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

**16.** 340 U.S. at 186, 71 S.Ct. at 219 (citing *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934)).

what is fairly appropriate to its purpose and not necessarily what is best.[17]

■■■ With regard to Amerada's second argument that the Act could alter the right of individuals under existing spacing and pooling orders to receive certain proceeds on a tract allocation basis as provided by 52 O.S.1981 § 87.1(e) (amended 1985) as interpreted by this Court in *Shell Oil Co. v. Corporation Commission*, 389 P.2d 951 (Okla.1964) (commonly referred to as the *Blanchard* decision), we conclude the Act does not violate Article 5, § 54 of the Oklahoma Constitution.[18] The constitutional reference to an "accrued right" means a matured cause of action[19] not simply a right or privilege in general which accrues under proceedings which have begun. Amerada does not argue the existence of any accrued cause of action which has been disturbed by the Act.

■■■ Lastly, Amerada maintains under its due process challenge the provisions of · the Act are unconstitutionally vague. In support of this contention, it construes various sentences of Section 544 as conflicting mandates requiring both unit allocation and contract allocation. It points to the second sentence thereof asserting it requires an allocation of all proceeds on a unit basis.[20] It further notes the language in the third

and fourth sentences and asserts they appear to provide for sharing of gas proceeds on a contract basis.[21]

A general rule of statutory construction is that "[l]egislative acts are to be construed in such manner as to reconcile the different provisions and render them consistent and harmonious, and give intelligent effect to each."[22] In addition, this Court has stated:

"A general rule is that all legislative enactments must be interpreted in accordance with their plain ordinary meaning according to the import of the language used."

and

"In determining legislative intention words, phrases, and expressions will be accorded their ordinary meaning when practical to do so, ..."[23]

Furthermore, "a statute should be given a sensible construction, bearing in mind the evils intended to be avoided or the remedy afforded."[24]

Applying these recognized principles relating to construction of legislative enactments to the present Act, we find the sensible construction to be given to the noted provisions is that urged by Seal and the Commission. The second sentence provides a general rule of ownership as to gas

---

**17.** *Id.; Hud Oil and Refining Co. v. City of Oklahoma City*, 167 Okl. 457, 30 P.2d 169 (1934).

**18.** Okla. Const. art. 5, § 54 provides:
"The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any *accrued right*, or penalty, incurred, or proceedings begun by virtue of such repealed statute." (Emphasis added).

**19.** *Cowart v. Piper Aircraft Corp.*, 665 P.2d 315 (Okla.1983); *Barry v. Board of Commissioners of Tulsa County*, 173 Okl. 645, 49 P.2d 548 (1935).

**20.** The second sentence of 52 O.S.Supp.1983 § 544 reads:
"The amount of gas produced daily, irrespective of the owner producing, belongs to, is owned by and shall inure to the benefit of each owner in the well in proportion to each owner's interest in the well."

**21.** The third and fourth sentences of 52 O.S. Supp.1983 § 544 read:

"Each owner who produces natural gas or casinghead gas and who separately sells or otherwise disposes of the gas must account to each other owner in the well not selling or otherwise disposing of gas from the well for that owner's part of the gas so disposed of or sold. In addition, each selling or disposing owner must compensate each owner not selling or disposing of gas from the well for that owner's proportionate part of the gas disposed of or sold."

**22.** *Eason Oil Corp. v. Corporation Commission*, 535 P.2d 283, 286 (Okla.1975) (citing *Personal Loan & Finance Co. v. Oklahoma Tax Com'n*, 437 P.2d 1015 (Okla.1968)).

**23.** *Id.* (quoting *Alfalfa Electric Coop., Inc. v. First National Bank & Trust Co.*, 525 P.2d 644 (Okla. 1974)).

**24.** *AMF Tubescope Company v. Hatchel*, 547 P.2d 374, 379 (Okla.1976).

which is reduced to possession from a well to be given effect by the method set forth in the following sentences. The third and fourth sentences provide the method by which owners selling under contract are required to compensate other owners not selling under contract for their proportionate share of gas sold. Consequently, we find no merit in Amerada's argument as to vagueness.[25]

## V.

### IMPAIRMENT OF CONTRACTUAL OBLIGATIONS

■ We next address Amerada's contention that the Act impairs the obligations of contracts in violation of the Contract Clause of the federal and state constitutions.[25] In making this argument, Amerada maintains first that the Act creates a class of third party beneficiaries who benefit from existing gas purchase contracts contrary to the intention of the parties to the contract as required by 15 O.S. 1981 § 29. It points out that under the Act a non-contracting party benefits under the contract but has no apparent burdens. Consequently, in times of upward market price adjustment he would be free to sell his gas to another purchaser for a higher price than that provided in the contract from which he is benefitting, as his acreage would not be dedicated to the purchaser under the contract. As set forth in Part IV of this opinion, 15 O.S. 1981 § 29 does not support this argument. Nor does 52 O.S. Supp.1983 § 542 support this position. The non-contracting party may reject an offer presented by the operator to purchase the gas; or if the operator has failed to present an offer within 120 days, after the non-contracting party has elected to allow the operator to market the gas, the election may be rescinded in writing. A non-contracting party, who has accepted an offer to purchase gas is bound by the agreement. Furthermore, we do not believe the Act creates a third party beneficiary contract. On the contrary, it affords no right to a third party to sue on another's contract. The benefits to the non-contracting party arise incidentally to the performance of the contract due to the rights created by the Act. Accordingly, Amerada's challenge under 15 O.S. 1981 § 29 has no merit.

■ Secondly, Amerada asserts the Act impairs the obligations under the royalty clause contained in many existing oil and gas leases which generally provide for allocation of production from a well on a unit basis for owners of royalty interests and an allocation on a tract basis for owners of working interests. Under this scheme of allocation pursuant to this Court's interpretation of 52 O.S. 1961 § 87.1 in *Shell Oil Co. v. Corporation Commission*, 389 P.2d 951 (Okla.1963), all burdens on the various working interests, other than the statutorily recognized one-eighth royalty paid proportionately by each working interest owner to each holder of a royalty interest in a well, were satisfied from the portion of production allocated to the working interest to which they were attached. In *Shell Oil Co., supra*, this Court interpreted the statutory scheme of allocation as superseding the terms of lease agreements as understood by the industry. Although the industry may have arranged its affairs in accordance with the *Shell Oil Co.* case, the current scheme is likewise subject to subsequent actions of the Legislature which may also have a disturbing effect. We simply cannot agree that parties have an accrued right to an allocation of proceeds of gas pursuant to Section 87.1 as interpreted in *Shell Oil Co.* The statutory allocation scheme which altered existing contract terms, like all legislation setting forth the terms on which private parties may execute contracts, is subject to revision or repeal. Moreover, the existence of an atmosphere of pervasive regulation of the natural gas

---

**25.** The federal Contract Clause provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts...." U.S. Const., art. I, § 10, cl. 1. Similarly, the comparable state constitutional provision contained in Okla. Const., art. 2, § 15 provides that "nor any law impairing the obligation of contracts, shall ever be passed."

industry[26] strongly suggests the parties had no legitimate expectation that the statutory scheme was a stable, unchanging one. Interest owners thus must hold their interests with the knowledge that the State retains substantial regulatory power over those interests.[27]

██ Thirdly, Amerada asserts the Act unconstitutionally impairs contract rights because it modifies the terms of the "standard" operating agreement by converting the operator's *right* to sell gas on behalf of owners who do not have a contract into an *obligation*. In addition, it argues the Act eliminates the right of an interest owner to take gas in kind and separately dispose of his own share of production which owners generally had under the operating agreement. It notes Section 544 of the Act requires an owner taking in kind to share his market immediately with other owners in the unit and then argues this arbitrary "across the board" application, irrespective of particular circumstances, does not allow equitable balancing pursuant to long standing custom and practice in the industry.

In connection with custom within the industry, we have stated: "Custom or usage repugnant to expressed provisions of statute is void."[28] Accordingly, no amount of custom can be the basis for our decision herein. We therefore cannot conclude that the Legislature impaired a private contractual right simply by enacting legislation that was contrary to industry custom and practice. Moreover, Section 542(D) expressly provides: "Nothing in this act shall be construed to prevent any owner or owners ... from taking their share of production in kind or separately disposing of their share."

██ The United States Supreme Court has addressed Contract Clause challenges to oil and gas state legislation in two recent opinions. In *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S.

400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the Court upheld the constitutionality of a Kansas act which imposed price controls on the intrastate gas market with regard to contracts executed before April 20, 1977, and prohibited consideration either of ceiling prices set by federal authorities or of prices paid in Kansas under other contracts in the application of governmental price escalator and price redetermination clauses. In 1975, a natural gas producer had entered into intrastate gas sales contracts with a public utility which contained a governmental price escalator clause and a price redetermination clause. The Court rejected the public utility's argument that the Kansas act violated the Contract Clause because it diminished the effect of the indefinite escalator clause in the contracts by limiting the increases allowed under the Natural Gas Policy Act (NGPA). No sufficient impairment of the public utility's contract was found to give rise to a Contract Clause challenge. The two factors which influenced the Court's decision were, first, the finding that it was highly unlikely at the time of execution of the contracts that the public utility anticipated the deregulation of gas prices introduced by the NGPA and; thus, the public utility did not have a reasonable expectation to receive deregulated prices which would have been impaired by the Kansas act. And, second, the parties were operating in a heavily regulated industry; therefore, the public utility knew its contractual rights were subject to alteration by state price regulation.

In *Exxon Corp. v. Eagerton*, 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983), the Alabama statute under review increased the severance tax on oil and gas extracted from Alabama wells, exempted royalty owners from the increase and prohibited producers from passing on the increase to their purchasers. The Court held the royalty owner exemption and the pass-

---

**26.** See e.g., *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 413, 103 S.Ct. 697, 705, 74 L.Ed.2d 569 (1983).

**27.** *Id.*

**28.** *Tenneco*, 687 P.2d at 1054 (quoting *Okla. N.M. & P. Ry. Company v. Downey*, 116 Okl. 253, 244 P. 173 (1926)).

through prohibition did not impair the obligations of contracts in violation of the Contract Clause. Although the Court found the pass-through prohibition affected contractual obligations of which producers were beneficiaries, it concluded the prohibition did not offend the Contract Clause. The Court noted as the distinguishing factor in this case:

> "[T]he pass-through prohibition did not prescribe a rule limited in effect to contractual obligations or remedies, but instead imposed a generally applicable rule of conduct designed to advance 'a broad societal interest' protecting consumers from excessive prices." *Exxon Corp.*, 462 U.S. at 191, 103 S.Ct. at 2306 (Citation omitted).

In footnote the Court stated its conclusion was buttressed by the fact that appellants operate in industries that have been subject to heavy regulation.

The essence of the appropriate Contract Clause standard articulated by the Court in these two cases is as follows: The threshold determination is whether the legislation has substantially impaired contractual rights. If no substantial impairment exists, the analysis is at an end and the legislation is upheld. If substantial impairment is found, it is justified only if the State's legislation is addressed to "a significant and legitimate public purpose ... such as the remedying of a broad and general social or economic problem" [29] and the means selected to achieve that end is based " 'upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " [30] The determination of the necessity and reasonableness of the means chosen is deferred to legislative judgment unless the state itself is a contracting party.

Applying this standard to the present case, our initial determination is whether the Act has, in fact, operated as a substan-

tial impairment of a contractual relationship. In determining the severity of the impairment consideration is given to the parties' reliance upon the contractual rights and obligations allegedly impaired.[31]

Amerada asserts the Act substantially impairs existing contractual relationships in that it negates the right accorded by a joint operating agreement to every party to the agreement to take in kind or separately dispose of his share of production and retain the benefits, i.e., production revenues, of such right. It further contends that such parties possessed a legitimate contractual expectation that such right was secure and not subject to being abrogated by subsequent legislation. We disagree.

The State of Oklahoma like the State of Kansas in *Energy Reserves Group, Inc.*, has extensively and continuously regulated the natural gas industry. Although Oklahoma has not required a ratable sharing of proceeds specifically, it has regulated production and purchasing in the industry. Much of Amerada's assertions necessarily fall with our foregoing conclusion that the parties could not have reasonably expected that their contractual rights were immune from alteration by subsequent State regulation. We thus find Amerada's reasonable expectations have not been substantially impaired by the Act.

Even if an impairment were found, the Act was enacted to protect a broad societal interest, i.e., the protection of correlative rights. We are not persuaded by Amerada's contention that the Act is nothing more than "special interest legislation." To the contrary, the Act imposes a general rule of conduct for the natural gas industry.

## VI.

## THE RULES

On December 21, 1983, the Commission promulgated the Rules to administer the

---

**29.** 459 U.S. at 411–412, 103 S.Ct. at 704–705.

**30.** 459 U.S. at 412, 103 S.Ct. at 705 (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977)).

**31.** *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978); *cf. Energy Reserves Group, Inc.*, 459 U.S. at 413–16, 103 S.Ct. at 705–07.

provisions of the Act pursuant to Section 547 to be effective January 1, 1984. Amerada's primary position is the Rules are void *in toto* because the Act is unconstitutional. As we have previously found the Act constitutional this position has no merit. Seal challenges the validity of various provisions of the Rules and argues that such provisions are contrary to the express intent of the Act. Seal urges this Court to strike down the alleged conflicting Rules. The Commission, on the other hand, asserts the Rules do administer the purpose of the Act and urges sustention of the Rules *in toto*. The specific provisions attacked will now be addressed in turn.

Seal first attacks the validity of Rule 6–100 [32] to the extent that it exempts parties to existing gas balancing agreements from the application of the Act. It argues these exclusionary provisions of Rule 6–100 are in direct conflict with Section 541 which provides for the express purpose and intent of the Act to afford all interest owners an equal opportunity to extract, sell and be paid for their proportionate share of the gas produced. It further asserts such provisions are contrary to Section 544 which provides that each day's production shall belong to each interest owner in proportion to each owner's interest. Additionally, it maintains if this Court limits the Act consistent with Rule 6–100, this will result in cutting off the receipt of royalty in excess of the basic ⅛th of royalty owners whose corresponding working interest owners have entered into gas balancing agreements in a manner other than as set forth in the Rules but have no gas purchase contract.

We believe that Section 542(D), which states that the Act shall not be construed to interfere with contractual rights or to prevent any owner from taking its share of production in kind or separately disposing of its share, also includes an owner's right to enter into gas balancing agreements which provide for the disposition between interest owners. We find nothing in the Act which expresses an intent to prevent such agreements. Moreover, contrary to Seal's contentions, such royalty owners' recovery is merely delayed until such time as the provisions of the pertinent gas balancing agreements come into effect, not precluded entirely. The exclusionary provisions were apparently designed to minimize the impairment of obligations under private contractual arrangements between interest owners to any extent greater than that which is absolutely necessary to protect the rights and correlative rights of the parties. We reject, however, the Commission's construction of the Act raised on appeal in response to Seal's challenge to the Rule, under which royalty owners and overriding royalty owners would be accorded an independent right to produce gas and enter into contracts for its sale.[33] Upon an examina-

---

**32.** Rule 6–100 provides:

"A. All interest owners in a well producing natural gas or casinghead gas shall be afforded an equal opportunity to extract their fair share of gas and to sell said gas and to be paid in proportion to their interest therein. *In the event any interest owner in such a well is a party to a joint operating agreement, gas balancing agreement and/or any other written agreement, then to the extent that the provisions of such agreement or agreements expressly provide for the taking, sharing or gas balancing of gas produced from such well in a manner other than as set forth in these Rules, then such provisions shall bind that interest owner who is a party to such agreement or agreements as between the parties to the exclusion of the marketing, revenue sharing and gas balancing provisions provided hereunder.*

"B. As used in Rule 6–100 through Rule 6–113:

1. 'Interest owner' is a working interest owner or any person in a well having the right to produce or separately dispose of his gas;

2. 'Contracted party' is any interest owner in an oil or gas well who is a party to a contract for the sale of gas produced from that oil or gas well;

3. 'Non-contracted party' is any interest owner in an oil or gas well who does not have a gas contract for his share of gas production *and who has not entered into any other agreement as provided above that governs the taking or sharing of gas* and, therefore, is not subject to the provisions of these Rules." (Emphasis supplied).

**33.** The Commission relies upon the term "owner" or "owners" as used in 52 O.S.Supp.1983 § 542(A), (D) which we construe to mean parties who have a right to take their share of

tion of the Act we find this construction was clearly not intended by the Legislature or the Commission. It is fundamental that an oil and gas lease grants to lessees the right to drill and produce. And, a concomitant principle is that royalty and overriding royalty owners (the mineral owners/lessors) are without the right to drill and produce for they have given up such right in exchange for a specified bonus consideration and royalty on production.[34] By bringing into balance the rights of all owners of the right to drill and produce the Act will also benefit royalty and overriding royalty owners whose rights derive from those of the owners of the right to drill and produce. We, therefore, conclude that Rule 6–100 does not vitiate the overall purpose of the Act.

 Seal contends Rule 6–102 erroneously limits the application of the gas balancing provisions of the Act to proceeds of production received on or after May 3, 1983, the effective date of the Act. It argues the revenue sharing provisions of the Act have full retroactive effect as to revenue received prior to May 3, 1983. In support of this argument it references legislative history including the comments of one of the co-authors of the Act regarding its intent and purpose and also S.C. Resolution No. 7 of the Legislature.

We first note, "[a] cardinal principle of statutory construction is that where the language of a statute is plain and unambiguous and the meaning clear and unmistakable, there is no room for construction, and no justification exists for interpretive devices to fabricate a different meaning."[35] Also, "[i]t is the rule of statutory construction that all statutes are to be construed as having a prospective operation unless the purposes and intention of the Legislature to give them a retrospective effect is expressly declared, or is necessarily implied from the language used."[36]

We conclude that the Legislature's use of particular language in the Act evidences an intent that it is to be applied prospectively only. Furthermore, the Legislature does not expressly declare, nor by implication, that the Act should have retroactive effect. For instance, Sections 543 and 544 provide for "on and after the effective date of this act" and speak in terms of the present tense. We find the Act is to be applied prospectively only and thus sustain the validity of Rule 6–102.

 Seal next challenges specific provisions of Rules 6–101, 6–102, 6–103, 6–107 and 6–112 on the basis that such Rules are in conflict with the provisions of 52 O.S. Supp.1985 § 540 as incorporated in the Act by Section 545.[37] Rule 6–101 provides for

production in kind or to separately dispose of their share.

**34.** *O'Neill v. American Quasar Petroleum Co.,* 617 P.2d 181, 184 (Okla.1980); *Hinds v. Phillips Petrol Co.,* 591 P.2d 697 (Okla.1979).

**35.** *In re Guardianship of Campbell,* 450 P.2d 203 (Okla.1966).

**36.** *Hammons v. Muskogee Medical Center Authority,* 697 P.2d 539 (Okla.1985); *Wickham v. Gulf Oil Corp.,* 623 P.2d 613 (Okla.1981); *Good v. Keel,* 29 Okl. 325, 116 P. 777 (1911).

**37.** 52 O.S.Supp.1985 § 540 provides in relevant part:

"A. The proceeds derived from the sale of oil or gas production from any oil or gas well shall be paid to persons legally entitled thereto, commencing no later than six (6) months after the date of first sale, and thereafter no later than sixty (60) days after the end of the calendar month within which subsequent production is

sold. Such payment is to be made to persons entitled thereto by the first purchasers of such production.... The first purchaser shall be exempt from the provision of this subsection and the owner of the right to drill and to produce under an oil and gas lease or force pooling order shall be substituted for the first purchaser therein where the owner and purchaser have entered into arrangements where the proceeds are paid by the purchaser to the owner who assumes the responsibility of paying the proceeds to persons legally entitled thereto."

"B. Any said first purchasers or owner of the right to drill and produce substituted for the first purchaser as provided herein that violates this act shall be liable to the persons legally entitled to the proceeds from production for the unpaid amount of such proceeds with interest thereon at the rate of twelve percent (12%) per annum, calculated from date of first sale." 52 O.S.Supp.1983 § 545 provides:

"Proper distribution of revenues from the sale of production from the well shall be made pur-

sharing of proceeds of sales of natural gas as between contracted and non-contracted parties in gas sales contracts entered into on or after January 1, 1984, the effective date of the Rules. Similarly, as discussed above, Rule 6–102 provides for revenue sharing between contracted and non-contracted parties for sales of gas on or after May 3, 1983, up to the effective date of the Rules under contracts entered into prior to May 3, 1983, the effective date of the Act. Rule 6–103 provides for revenue sharing between such parties for gas sales on or after the effective date of the Act and prior to the effective date of the Rules under contracts entered into during the same period. The provisions of all three Rules are similar except they are each addressed to different situations concerning the date of production and the date of entry into a gas purchase contract as such dates relate to the effective dates of the Act and the Commission's Rules. Common to each of these Rules is the provision that "each contracted party shall distribute revenues, pursuant to the provision of 52 O.S. 1981 § 540 [amended 1985], to such non-contracted parties to the extent of that party's interest in the revenue from the sale of each contracted party's gas production sold." [38]

Section 540 expressly governs the payment of royalties on production from an oil or gas unit. The obligation for payment of royalties is placed initially on the first purchaser of production. However, a first purchaser may be exempted from this obligation if it enters into an arrangement with an "owner of the right to drill and to produce under an oil and gas lease or force pooling order" and such owner assumes the obligation. Seal initially maintains the quoted language creates two distinct classes of owners qualified to assume the obligation—lessees in units not subject to force pooling and operators of force pooled

units. Although Seal inconsistently later asserts that an operator is the only proper party to substitute for a first purchaser under Section 540 regardless of whether a unit is voluntarily pooled or forced pooled. Seal argues Rules 6–101, 6–102 and 6–103, in their references to the responsibilities of contracted parties to make distribution of production proceeds to non-contracted parties, ignore the provisions of Section 540 which, under its interpretation, only operators may be substituted for first purchasers in assuming responsibility for payment.

Upon a proper reading of the Rules as they relate to Section 540, it is clearly demonstrated that no conflict exists. Under the plain meaning of Section 540, an owner of the right to drill, whether such right was acquired by lease or by force pooling, may be substituted for the first purchaser in taking responsibility for royalty payments under a suitable arrangement. Rules 6–101(F), 6–102(E) and 6–103(F) provide that the contracted party shall pay or cause to be paid to the non-contracted party its share of such proceeds. Each contracted party is an "owner in an oil or gas well who is a party to a contract for the sale of gas produced from that oil or gas well." [39] A contracted party will either have assumed the obligation of disbursement of gas production proceeds pursuant to Section 540 or such responsibility will be left upon the first purchaser, depending upon the terms of a particular gas purchase contract.

Seal also relies on its erroneous construction of Section 540 in arguing Rule 6–107 is violative of the requirements of Section 540. Rule 6–107(A) requires each working interest owner to be responsible for payment of all royalties, overriding royalties and other payments for which it is

suant to the provisions of Section 540 of Title 52 of the Oklahoma Statutes. If any owner receives revenues directly from the purchaser within which other owners are entitled to share ratably, the owner receiving such revenues shall forward the same to the party responsible for distribution pursuant to the provisions of Section 540 of Title 52 of the Oklahoma Statutes."

**38.** Rules 6–101(D), 6–102(C)(3) and 6–103(D). See also Rules 6–101(F), 6–102(E) and 6–103(D) which require the contracted parties to distribute revenues to the non-contracted parties pursuant to Section 52 O.S.Supp.1985 § 540.

**39.** Rule 6–100(B)(2).

obligated by law, lease or contract. However, Rule 6–107(B) allows an interest owner to enter into an agreement for the manner in which actual disbursement will be made and the party who will make such disbursement. Based upon a proper interpretation of Section 540, we find Rule 6–107 is also valid.

■ Section 540(A) additionally imposes a time frame requirement for distribution of revenues that gas production proceeds be paid to the persons legally entitled thereto, commencing, with certain exceptions, no later than six months after date of first sale, and thereafter no later than sixty days after the end of the month in which subsequent sales are made. Seal asserts that various provisions of the Rules violate the time of payment requirements of Section 540(A).[40] The Commission maintains the incorporation of Section 540 into the provisions of the Act by the Legislature was to provide a working framework for the distribution of funds between parties as production was sold. Additionally, it contends Section 540 was designed to apply to the scenerio where production has just begun, and has no application to the balancing of proceeds accrued from past sales. We disagree. We believe the Legislature in enacting Section 545 clearly incorporated the time frame provisions of Section 540 into the gas balancing scheme. We conclude the various time frames in which payment is to be made as set forth in the challenged Rules are inconsistent with the provisions of Section 540 as incorporated by Section 545 and are thus invalid.

■ Seal's final argument with regard to Section 540 pertains to Rule 6–112 which provides that an operator or contracted party who undertakes any obligations under the Rules shall have no liability thereunder, except in the case of gross negligence or willful misconduct. It is argued that Rule 6–112 fails to give effect to Section 540(B)'s provision for an assessment of a twelve percent interest penalty on any failure to pay under the term's of Section 540(A), and is, thus, invalid. The Commission argues to the contrary, that the Legislature only intended to adopt Section 540's scheme for distribution of revenues as to the parties responsible for the distribution and did not incorporate the penal provisions of Section 540 in the Act's reference to such Section.[41] In support of this argument the Commission asserts that "[f]orfeitures or penalties cannot be created by judicial implication, but must be expressly imposed by statute."[42] We find the penalties for failure to comply with the provisions of Section 540(A) were expressly incorporated into the Act based upon the actual words of Section 545 and there is no need to create such by judicial construction. Section 545 refers to the provisions of Section 540 and does not limit the scope of incorporation of Section 540 to only Subsection A thereof. Accordingly, we find Rule 6–112 invalid insofar as it does not incorporate the penalty provisions found in Section 540(B).

■ Seal next argues Rule 6–104(E) is invalid insofar as it provides for a twenty-five percent limitation on the reduction of an overproduced contracted party's shares

**40.** Rule 6–102(C)(3) provides for payment of production sold between the date of the effectiveness of the Act and the effective date of the rules "in equal monthly amounts over a period of the succeeding eight (8) months." Similarly Rule 6–103(D)(3) provides for payment, with respect to gas sold on or after the effective date of the Act and prior to the effective date of the Rules, under contracts entered into during the same period, "with equal monthly amounts over a period of time equal to the number of whole months from the date of first production ..." to the effective date of the Rules. Also, Rule 6–104(C)(1) provides that in the event a contracted party's gas contract expires, and he subsequent-

ly revenue shares, any underproduction attributable to him shall be carried forward until such time as he enters into a new contract or upon well depletion. Rule 6–104(F) requires cash balancing, without interest, on well depletion, for wells commencing production prior to the effective date of the Act.

**41.** *See, supra,* note 37.

**42.** *Incorporated Town of Bennington v. First National Bank of Bennington,* 172 Okl. 164, 44 P.2d 872 (1935).

to achieve balancing which is allegedly contrary to the express provisions of the Act.[43] It contends this Rule affects two classes of working interest owners: (1) working interest owners who have affirmatively elected not to share in revenues after the effective date of the Act, and (2) working interest owners who are excluded from the gas balancing provisions of the Act by Rule 6–100. Seal maintains the Act does not provide for balancing in kind and if it were to be used, the Rules should have provided that all future sales proceeds are to be paid to the underproduced working interest owners and their corresponding excess royalty owners until such time as the imbalance is corrected, without a twenty-five percent limitation requirement on the overproduced working interest owners' shares. The Commission counters that such a blanket provision as urged by Seal could only be expressly imposed by the Legislature as it could unduly penalize parties who have produced their full allowable. We are not persuaded. The Rule prevents non-contracted working interest owners from achieving a balanced position in the well by impeding their balancing capabilities so that they will never be allowed to get back into balance. We hence hold the challenged portion of Rule 6–104(E) invalid.

■ Seal argues Rule 1–108 which assesses a one percent administrative cost against each non-contracted party who elects to share in revenues is contrary to law, inequitable and deprives parties of their property without due process of law.[44]

It asserts the Commission has no authority to require a reduction in the ratable share to be distributed to non-contracting parties. The Commission seeks to justify the imposition of the assessment of administrative costs on the basis that such non-contracted parties will benefit from an imposed quasi-contractual relationship created by Section 544 and thus should bear the cost of it, citing *Welling v. American Roofing and Sheet Metal Co.*, 617 P.2d 206 (Okla.1980). It is further argued by the Commission it would be inequitable not to compensate the contracted parties for the expenses incurred in satisfying their obligation to account and to revenue share. Additionally it asserts that merely because the rate set is only an estimate of the actual costs does not mean that the rate has no actual relationship to the expenses incurred by revenue sharing. It contends the specific rate set is a reasonable estimate of administrative costs. We agree.

■ Seal's final challenge to the Rules is concerning the negligence or willful misconduct standard in hearings before the Commission imposed by Rule 6–112. Seal seeks clarification of this Rule in relation to Section 547 which grants the Commission the power to enforce penalties for violations of the Act and also affords the right to injured parties to recover treble damages for violations of the provisions of the Act in district court. The Commission attempts to justify Rule 6–112 by asserting such Rule has no application to district

---

**43.** Rule 6–104(E) provides:

"Any party governed by the provisions of this Rule who ultimately enters into a contract to separately sell or dispose of his share of gas, shall not make any such contract initially effective until the first day of the second month following notice to all contracted parties. He shall thereafter be eliminated from subsequent accounting for his share of the gas to the well operator by such contracted parties. Instead, he shall then inform all contracted parties in the well that he is now a contracted party and he shall begin accounting to the well operator and to all non-contracted parties pursuant to Rule 6–101, 6–102 or 6–103. When the newly contracted party begins to take his share of gas, *plus additional make-up gas to get into balance,* in no event

shall any other contracted party's share be reduced by more than twenty-five percent (25%)." (Emphasis added).

**44.** Rule 6–108 provides:

"Each non-contracted party in a well who revenue shares under Rule 6–101, 6–102, or 6–103 shall be subject to a monthly administrative expense of one percent (1%) of that amount of revenue due and owing as payment for that month, and in no event less than Five Dollars ($5.00). Said expense shall be billed by the operator, or shall be withheld by the contracted party from the gas revenue due to the non-contracted party, unless a separate arrangement is agreed upon in writing by the parties subject hereto."

court treble damage remedies authorized by Section 547. It maintains an action before the Commission to recover on liabilities from a breach of obligations imposed by the Rules is a totally separate and distinct action from one in district court for breach of the statutory duties. We find no distinction for the Rules were promulgated to administer the purpose of the Act. The practical effect of different standards for measuring liability in district court and the Commission would force parties to seek their remedies in district court where treble damages may be recovered without fault. We find the standard for penalties to be enforced by the Commission for violations of the Act and the Rules promulgated for its administration should be that imposed by Section 547 for district court actions. We therefore find Rule 6–112 to be invalid in this regard.

## VII.

## CONCLUSION

We conclude that the Act is constitutional. We further affirm the provisions of the Rules challenged herein except Rules 6–104(E), 6–102(C)(3), 6–103(D)(3), 6–104(C)(1), 6–104(F) and 6–112. We find invalid Rule 6–104(E) insofar as the twenty-five percent limitation on the reduction of an overproduced contracted party's shares to achieve balancing for it impedes non-contracted working interest owners' capabilities from ever achieving a balanced position in the well. We also find the time frames in which payment is to be made found in Rules 6–102(C)(3), 6–103(D)(3), 6–104(C)(1) and 6–104(F) are inconsistent with the provisions of Section 540 as incorporated by Section 545. We further reject Rule 6–112 which requires a different standard of measuring liability for violations of the Act and Rules thereunder in actions brought in the Commission as those actions brought in district court under the authority of 52 O.S.Supp.1983 § 547 for the recovery of threefold damages for violations of the Act. Moreover, Rule 6–112 fails to incorporate the interest penalty provisions found

in Section 540(B) as required by Section 545. We therefore find Rule 6–112 invalid.

SIMMS, C.J., DOOLIN, V.C.J., OPALA, WILSON, KAUGER, JJ., and GRAY, Special Judge, concur.

SUMMERS, J., concurs in result.

HARGRAVE, J., dissents.

LAVENDER, J., disqualified.

HARGRAVE, Justice, dissenting.

Whether the statutes examined here are prospective or retrospective, and whether the Corporation Commission rules correctly impliment the statutes, are not dispositive of the issues presented here.

The Commission states, in the preamble of the rules implimenting these statutes, that private contractual rights are subject to modification under the police power of the state to protect correlative rights. *Patterson v. Stanolind Oil & Gas Co.,* 182 Okl. 155, 77 P.2d 83 (1938). As said therein, it is well established that the police power of the state extends to protecting the correlative rights of owners in a common source of supply. The lawful exercise of the state's power to protect the correlative rights of owners in a common source of oil and gas is not violative of state or federal due process guarantees when the subject of this restriction is a valid exercise of the state police power upon subjects within its scope.

The dispositive issue here is whether or not 52 O.S.1983 §§ 540–547 is a valid exercise of the state's police power. Do these statutes protect correlative rights? If so, the established law affirms such action is a valid exercise of the police power of the state.

In the recent case of *Samson Resources Co. v. Corporation Com'n,* 702 P.2d 19 (Okl.1985), this Court referred to *Kingwood Oil Co. v. Corporation Commission,* 396 P.2d 1008, 1010 (Okl.1964), for a definition of correlative rights.

"The term 'correlative rights' has been defined as a convenient method of 'indicating that each owner of land in a com-

mon source of supply of oil and gas has legal privileges as against their owners of land therein to take oil and gas therefrom by lawful operations conducted on his own land, limited, however, by duties to other owners not to injure the source of supply and by duties not to take an undue proportion of the oil and gas'. Summers, Oil and Gas, Vol. 1, Sec. 63."

Immediately following that definition the Court referred to *United Petroleum Exploration, Inc. v. Premier Resources, Ltd.,* 511 F.Supp. 127 (W.D.Okl.1980), for a refinement of the term correlative rights which this Court has accepted in *Tenneco Oil Co. v. El Paso Natural Gas Co.,* 687 P.2d 1049 (Okl.1984).

"From this it can be seen that correlative rights are those rights which one owner possesses in a common source of supply in relation to those rights possessed by other owners in the same common source of supply. At this point, it must be emphasized that a common source of supply in which the owners of mineral interests possess correlative rights is the underlying geological strata from which the oil and gas is produced, rather than the well through which the oil and gas is reduced to possession. See, 52 Okla. Stat. 1971 § 86.1(c)."

It is clearly established that this Court is committed to the tenet that correlative rights refers to the mutual obligations of the separate owners of a common source of supply. Our definition of the term expressly negates the premise that correlative rights refers to the mutual obligation of owners of a single wellhole. *Samson, supra,* states:

"The relief requested by Tenneco in this case, the replacement of an operator designated under a voluntary pooling agreement in order to protect 'correlative rights', is clearly beyond the Commission's conferred jurisdiction, as it concerns a dispute between private parties in which the public interest in correlative rights is not involved...."

The police power is the power to enact laws, to promote order safety, health, and general welfare of society. A legislative police power enactment is not conclusive of an asserted public interest or general welfare. This is a matter that is always open to judicial inquiry, and a determination of what is a proper exercise of the police power is always subject to supervision of the court. *Gates v. Easter,* 354 P.2d 438 (Okl.1960). The public interest required to be present before private property may be subject to public regulation must amount to something more than a desire to regulate conceived out of personal concern as to future events, convenience or covetous use of another's property. It does not mean anything so narrow as mere curiosity, or the interests of particular localities which may be affected by the matters in question. *Oklahoma Natural Gas Co. v. Choctaw Gas Co.,* 205 Okl. 255, 236 P.2d 970 (1951).

As discussed, correlative rights refers to mutual duties and obligations of owners of a common source of supply. Regulation of the allocation of benefit derived from production from a single well is not an act designed to protect correlative rights, but is instead an attempt to legislate relationships established by private contractual agreements. Such legislation does not protect correlative rights as argued by the Commission, nor is it a valid exercise of the police power. Such regulations are not designed to promote the general public welfare, but, to regulate private contractual rights for the benefit of certain parties owning an interest in a single wellhole. As such the regulations here examined are found not to be a valid exercise of the police power. In its effect these regulations stand on the same theoretical footing as that struck down in *Thompson v. Consolidated Gas Utilities Corp.,* 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510 (1937). *Thompson* was referred to in *Oklahoma Natural Gas Co. v. Choctaw Gas Co., supra. Thompson* states:

"But the sole purpose of the limitation which the order imposes upon the plaintiffs' production is to compel those who may legally produce, because they have market outlets for permitted uses, to

purchase gas from potential producers whom the statute prohibits from producing because they lack such a market for their possible product. Plaintiffs' operations are neither causing nor threatening any overground or underground waste. Every well owner in the field is free to produce the gas, provided he does not do so wastefully. He is legally and, so far as appears, physically free to provide himself with a market and with transportation and marketing facilities.

. . . . .

[T]he purpose of the Commission underlying these orders was, upon a theory of protecting correlative rights, to coerce complainant and other [others] similarly situated to buy gas from, and thus to share their private marketing contracts and commitments and the use of their pipe lines and other facilities for transmitting their gas to market with the owners of wells not now connected to pipe lines, who have not contributed in money, services, negotiations, skill, forethought or otherwise to the development of such markets and the construction of such pipe lines and other facilities. In short to compel complainants to afford markets to those having none."

The act examined in this case has substantially the same effect as that examined in *Thompson, supra*. The statutory scheme established by the act simply rearranges the contractual obligations of private individuals for the benefit of a subclass of well owners not having a contract to sell their product. As such it is not a proper exercise of the state's police power, for the law benefits one subclass of well owners at the expense of others and is thus not designed to benefit the general welfare of the people of the state. Nor can the act be said to prevent waste or protect correlative rights. The Corporation Commission has attempted to ameliorate the obvious constitutional flaws with the act by enacting rules which, in effect, emasculate the act. Statutes should be construed so as to uphold their constitutionality, but in this instance it is obvious that the construction given the act

is not supportable by a plain reading of it. The construction given the act by the Commission's rules is an attempt to rewrite the act, not interpret it.